# WASHINGTON ET AL. *v.* WASHINGTON STATE COMMERCIAL PASSENGER FISHING VESSEL ASSOCIATION ET AL.

No. 77–983.   Argued February 28, 1979—Decided July 2, 1979*

*Together with *Washington et al.* v. *Puget Sound Gillnetters Assn. et al.*, also on certiorari to the same court (see this Court's Rule 23 (5)) ; and No. 78–119, *Washington et al.* v. *United States et al.*, and No. 78–139, *Puget Sound Gillnetters Assn. et al.* v. *United States District Court for the Western District of Washington* (*United States et al., Real Parties in Interest*), on certiorari to the United States Court of Appeals for the Ninth Circuit.

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined and in Parts I, II, and III of which STEWART, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed an opinion dissenting in part, in which STEWART and REHNQUIST, JJ., joined, *post*, p. 696.

*Slade Gorton,* Attorney General of Washington, argued the cause for the State of Washington. With him on the briefs were *Edward B. Mackie,* Deputy Attorney General, *James M. Johnson,* Senior Assistant Attorney General, and *Timothy R. Malone,* Assistant Attorney General. *Philip A. Lacovara* argued the cause for the Puget Sound Gillnetters Association et al. With him on the briefs were *Charles E. Yates, Douglas Fryer, Joseph T. Mijich,* and *Gerald Goldman. Richard W. Pierson* filed a brief for the Washington State Commercial Passenger Fishing Vessel Association in all cases.

*Louis F. Claiborne* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General*

*Barnett,* and *Kathryn A. Oberly. Mason D. Morisset* argued the cause for the Lummi Indian Tribe et al. With him on the brief were *Steven S. Anderson, Thomas P. Schlosser, Alan C. Stay, Robert Pelcyger, Daniel A. Raas, William H. Rodgers, Jr.,* and *John Clinebell. Michael Taylor* filed a brief for the Quinault Indian Nation. *James B. Hovis* filed a brief for the Yakima Nation, respondent in Nos. 78–119 and 78–139. *Dennis C. Karnopp* and *Douglas Nash* filed a brief for the Confederated Tribes of the Warm Springs Reservation Oregon et al., respondents in Nos. 78–119 and 78–139.†

MR. JUSTICE STEVENS delivered the opinion of the Court.

To extinguish the last group of conflicting claims to lands lying west of the Cascade Mountains and north of the Columbia River in what is now the State of Washington,[1] the United States entered into a series of treaties with Indian

---

†Briefs of *amici curiae* urging reversal in No. 77–983 and affirmance in Nos. 78–119 and 78–139 were filed by *David H. Getches, Burt Neuborne,* and *Stephen L. Pevar* for the American Civil Liberties Union et al.; and by *Arthur Lazarus, Jr.,* for the Nez Perce Tribe of Idaho.

Briefs of *amici curiae* were filed by *Frederick L. Noland* for the American Friends Service Committee et al.; by *J. Carl Mundt* and *Henry H. Happel III* for the American Institute of Fishery Research Biologists; by *Don S. Willner* for the Northwest Steelhead and Salmon Council of Trout Unlimited; by *Ronald A. Zumbrun* and *John H. Findley* for the Pacific Legal Foundation; and by *Paul W. Steere* for the Pacific Seafood Processors Association.

[1] By three earlier treaties the United States had extinguished the conflicting claims of Spain in 1820 and Russia in 1824, 8 Stat. 252, 302, and Great Britain in 1846, 9 Stat. 869. In 1848, Congress established the Oregon Territory, 9 Stat. 323; that statute provided that nothing contained therein "shall be construed to impair the rights of person or property now pertaining to the Indians and said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians." In 1850, Congress authorized the negotiation of treaties to extinguish the Indian claims to land lying west of the Cascade Mountains, 9 Stat. 437. In 1853, the Washington Territory, which includes the present State of Washington, was organized out of the Oregon Territory. Ch. 90, 10 Stat. 172.

tribes in 1854 and 1855.[2] The Indians relinquished their interest in most of the Territory in exchange for monetary payments. In addition, certain relatively small parcels of land were reserved for their exclusive use, and they were afforded other guarantees, including protection of their "right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory." 10 Stat. 1133.

The principal question presented by this litigation concerns the character of that treaty right to take fish. Various other issues are presented, but their disposition depends on the answer to the principal question. Before answering any of these questions, or even stating the issues with more precision, we shall briefly describe the anadromous fisheries of the Pacific Northwest, the treaty negotiations, and the principal components of the litigation complex that led us to grant these three related petitions for certiorari.

I

Anadromous fish hatch in fresh water, migrate to the ocean where they are reared and reach mature size, and eventually complete their life cycle by returning to the fresh-water place of their origin to spawn. Different species have different life cycles, some spending several years and traveling great distances in the ocean before returning to spawn and some even returning to spawn on more than one occasion before dying.

---

[2] Treaty of Medicine Creek (10 Stat. 1132); Treaty of Point Elliott (12 Stat. 927); Treaty of Point No Point (12 Stat. 933); Treaty of Neah Bay (12 Stat. 939); Treaty with the Yakamas (12 Stat. 951); and Treaty of Olympia (12 Stat. 971). The parties to the treaties and to this litigation include these Indian tribes: Hoh; Lower Elwha Band of Clallam Indians; Lummi; Makah; Muckleshoot; Nisqually; Nooksack; Port Gamble Band of Clallam Indians; Puyallup; Quileute; Quinault; Sauk-Suiattle; Skokomish; Squaxin Island; Stillaguamish; Suquamish; Swinomish; Tulalip; Upper Skagit; and Yakima Nation. 384 F. Supp. 312, 349; 459 F. Supp. 1020, 1028.

384 F. Supp. 312, 384, 405. See Comment, State Power and the Indian Treaty Right to Fish, 59 Calif. L. Rev. 485, 501, and n. 99 (1971). The regular habits of these fish make their "runs" predictable; this predictability in turn makes it possible for both fishermen and regulators to forecast and to control the number of fish that will be caught or "harvested." Indeed, as the terminology associated with it suggests, the management of anadromous fisheries is in many ways more akin to the cultivation of "crops"—with its relatively high degree of predictability and productive stability, subject mainly to sudden changes in climatic patterns—than is the management of most other commercial and sport fisheries. 384 F. Supp., at 351, 384.

Regulation of the anadromous fisheries of the Northwest is nonetheless complicated by the different habits of the various species of salmon and trout involved, by the variety of methods of taking the fish, and by the fact that a run of fish may pass through a series of different jurisdictions.[3] Another complexity arises from the fact that the State of Washington has attempted to reserve one species, steelhead trout, for sport fishing and therefore conferred regulatory jurisdiction over that species upon its Department of Game, whereas the various species of salmon are primarily harvested by commercial fishermen and are managed by the State's Department of Fisheries. *Id.*, at 383–385, 389–399. Moreover, adequate regulation not only must take into account the potentially

---

[3] For example, pink and sockeye salmon hatched in Canada's Fraser River pass through the Strait of Juan de Fuca in the State of Washington, swim out into international waters on the open sea, and return through the strait to the river, passing on the way the usual and accustomed fishing grounds of the Makah Indian Tribe once again in Washington. 384 F. Supp., at 392. During much of the return run during which they pass through international, state, and Canadian waters, the fish are in optimum harvestable condition. See also *id.*, at 386–387, regarding the Puget Sound and Olympic Peninsula origin chinook salmon that pass through international waters, as well as those of Washington, Canada, and Alaska.

conflicting interests of sport and commercial fishermen, as well as those of Indian and nontreaty fishermen, but also must recognize that the fish runs may be harmed by harvesting either too many or too few of the fish returning to spawn. *Id.,* at 384, 390.

The anadromous fish constitute a natural resource of great economic value to the State of Washington. Millions of salmon, with an average weight of from 4 or 5 to about 20 pounds, depending on the species, are harvested each year. Over 6,600 nontreaty fishermen and about 800 Indians make their livelihood by commercial fishing; moreover, some 280,000 individuals are licensed to engage ·in sport fishing in the State.[4]  *Id.,* at 387.  See *id.,* at 399.

## II

One hundred and twenty-five years ago when the relevant treaties were signed, anadromous fish were even more important to most of the population of western Washington than they are today. At that time, about three-fourths of the approximately 10,000 inhabitants of the area were Indians. Although in some respects the cultures of the different tribes varied—some bands of Indians, for example, had little or no tribal organization [5] while others, such as the Makah and the Yakima, were highly organized—all of them shared a vital and unifying dependence on anadromous fish. *Id.,* at 350. See *Puyallup Tribe* v. *Washington Game Dept.,* 433 U. S. 165, 179 (BRENNAN, J., dissenting in part).

---

[4] Although in terms of the number and weight of the fish involved, the commercial salmon catch is far more substantial than the recreational steelhead catch, the latter apparently provides the State with more revenue than the former, involves more people, and has accordingly been a more controversial political issue within the State.  See *id.,* at 399.

[5] Indeed, the record shows that the territorial officials who negotiated the treaties on behalf of the United States took the initiative in aggregating certain loose bands into designated tribes and even appointed many of the chiefs who signed the treaties.  *Id.,* at 354–355, 366.

Religious rites were intended to insure the continual return of the salmon and the trout; the seasonal and geographic variations in the runs of the different species determined the movements of the largely nomadic tribes. 384 F. Supp., at 343, 351, 382; 459 F. Supp. 1020, 1079; 520 F. 2d 676, 682. Fish constituted a major part of the Indian diet, was used for commercial purposes,[6] and indeed was traded in substantial volume.[7] The Indians developed food-preservation techniques

---

[6] "From the earliest known times, up to and beyond the time of the . . . treaties, the Indians comprising each of the treating tribes and bands were primarily a fishing, hunting and gathering people dependent almost entirely upon the natural animal and vegetative resources of the region for their subsistence and culture. They were heavily dependent upon anadromous fish for their subsistence and for trade with other tribes and later with the settlers. Anadromous fish was the great staple of their diet and livelihood. They cured and dried large quantities for year around use, both for themselves and for others through sale, trade, barter and employment." *Id.*, at 406. See also 520 F. 2d 676, 682 ("The Indians west of the Cascade Mountains were known as 'fish-eaters'; their diets, social customs, and religious practices centered on the capture of fish").

[7] "At the time of the treaties, trade was carried on among the Indian groups throughout a wide geographic area. Fish was a basic element of the trade. There is some evidence that the volume of this intra-tribal trade was substantial, but it is not possible to compare it with the volume of present day commercial trading in salmon. Such trading was, however, important to the Indians at the time of the treaties. In addition to potlatching, which is a system of exchange between communities in a social context often typified by competitive gifting, there was a considerable amount of outright sale and trade beyond the local community and sometimes over great distances. In the decade immediately preceding the treaties, Indian fishing increased in order to accommodate increased demand for local non-Indian consumption and for export, as well as to provide money for purchase of introduced commodities and to obtain substitute non-Indian goods for native products which were no longer available because of the non-Indian movement into the area. Those involved in negotiating the treaties recognized the contribution that Indian fishermen made to the territorial economy because Indians caught most of the non-Indians' fish for them, plus clams and oysters." 384 F. Supp., at

that enabled them to store fish throughout the year and to transport it over great distances. 384 F. Supp., at 351.[8] They used a wide variety of methods to catch fish, including the precursors of all modern netting techniques. *Id.*, at 351, 352, 362, 368, 380. Their usual and accustomed fishing places were numerous and were scattered throughout the area, and included marine as well as fresh-water areas. *Id.*, at 353, 360, 368–369.

All of the treaties were negotiated by Isaac Stevens, the first Governor and first Superintendent of Indian Affairs of the Washington Territory, and a small group of advisers. Contemporaneous documents make it clear that these people recognized the vital importance of the fisheries to the Indians and wanted to protect them from the risk that non-Indian settlers might seek to monopolize their fisheries. *Id.*, at 355, 363.[9] There is no evidence of the precise understanding the

---

351–352 (citations to record omitted). See also *id.*, at 364 (Makah Tribe "maintained from time immemorial a thriving economy based on commerce" in "marine resources").

[8] In late December 1854, one territorial official wrote the Commissioner of Indian Affairs that "[t]he Indians on Puget Sound . . . form a very considerable portion of the trade of the Sound. . . . They catch most of our fish, supplying not only our people with clams and oysters, but salmon to those who cure and export it." App. 329.

[9] Governor Stevens in discussing the policy that he intended to pursue during negotiations with the tribes, in a letter dated September 16, 1854, to the Commissioner of Indian Affairs, said:

"The subject of the right of fisheries is one upon which legislation is demanded. It never could have been the intention of Congress that Indians should be excluded from their ancient fisheries; but, as no condition to this effect was inserted in the donation act, the question has been raised whether persons taking claims, including such fisheries, do not possess the right of monopolizing. It is therefore desirable that this question should be set at rest by law." *Id.*, at 327. See also *id.*, at 332.

The Governor's concern with protecting the Indians' continued exploitation of their accustomed fisheries was reflected in his assurances to the Indians during the treaty negotiations that under the treaties they would be able to go outside of reservation areas for the purpose of harvesting

Indians had of any of the specific English terms and phrases in the treaty.[10] *Id.*, at 356. It is perfectly clear, however, that the Indians were vitally interested in protecting their right to take fish at usual and accustomed places, whether on or off the reservations, *id.*, at 355, and that they were invited by the white negotiators to rely and in fact did rely heavily on the good faith of the United States to protect that right.[11]

Referring to the negotiations with the Yakima Nation, by far the largest of the Indian tribes, the District Court found:

> "At the treaty council the United States negotiators promised, and the Indians understood, that the Yakimas would forever be able to continue the same off-reservation food gathering and fishing practices as to time, place, method, species and extent as they had or were exercising. The Yakimas relied on these promises and they formed a material and basic part of the treaty and of the Indians'

fish. His statement at the signing of the Treaty of Point Elliott on Monday, January 22, 1855, was characteristic:

"We want to place you in homes where you can cultivate the soil, using potatoes and other articles of food, and where you will be able to pass in canoes over the waters of the Sound and catch fish and back to the mountains to get roots and berries." *Id.*, at 329–330.

[10] Indeed, the translation of the English words was difficult because the interpreter used a "Chinook jargon" to explain treaty terms, and that jargon not only was imperfectly (and often not) understood by many of the Indians but also was composed of a simple 300-word commercial vocabulary that did not include words corresponding to many of the treaty terms. 384 F. Supp., at 330, 355–356, 364, 381; 520 F. 2d, at 683.

[11] For example, Governor Stevens made the following statement to the Indians gathered at Point-No-Point to negotiate the treaty bearing that name:

"Are you not my children and also children of the Great Father? What will I not do for my children, and what will you not for yours? Would you not die for them? This paper is such as a man would give to his children and I will tell you why. This paper gives you a home. Does not a father give his children a home? . . . This paper secures your fish? Does not a father give food to his children?" App. 330–331.

understanding of the meaning of the treaty." *Id.*, at 381 (record citations omitted).

See also *id.*, at 363 (similar finding regarding negotiations with the Makah Tribe).

· The Indians understood that non-Indians would also have the right to fish at their off-reservation fishing sites. But this was not understood as a significant limitation on their right to take fish.[12] Because of the great abundance of fish and the limited population of the area, it simply was not contemplated that either party would interfere with the other's fishing rights. The parties accordingly did not see the need and did not intend to regulate the taking of fish by either Indians or non-Indians, nor was future regulation foreseen.. *Id.*, at 334, 355, 357.

Indeed, for several decades after the treaties were signed, Indians continued to harvest most of the fish taken from the waters of Washington, and they moved freely about the Territory and later the State in search of that resource. *Id.*, at 334. The size of the fishery resource continued to obviate the need during the period to regulate the taking of fish by either Indians or non-Indians. *Id.*, at 352. Not until major economic developments in canning and processing occurred in the last few years of the 19th century did a significant non-Indian fishery develop.[13] It was as a consequence of these

---

[12] "There is nothing in the written records of the treaty councils or other accounts of discussions with the Indians to indicate that the Indians were told that their existing fishing activities or tribal control over them would in any way be restricted or impaired by the treaty. The most that could be implied from the treaty context is that the Indians may have been told or understood that non-Indians would be allowed to take fish at the Indian fishing locations along with the Indians." 384 F. Supp., at 357.

[13] "The non-Indian commercial fishing industry did not fully develop in the case area until after the invention and perfection of the canning process. The first salmon cannery in Puget Sound began in 1877 with a small operation at Mukilteo. Large-scale development of the commercial fish-

developments, rather than of the treaty, that non-Indians began to dominate the fisheries and eventually to exclude most Indians from participating in it—a trend that was encouraged by the onset of often discriminatory state regulation in the early decades of the 20th century. *Id.,* at 358, 394, 404, 407; 459 F. Supp., at 1032.[14]

In sum, it is fair to conclude that when the treaties were negotiated, neither party realized or intended that their agreement would determine whether, and if so how, a resource that had always been thought inexhaustible would be allocated between the native Indians and the incoming settlers when it later became scarce.

### III

Unfortunately, that resource has now become scarce, and the meaning of the Indians' treaty right to take fish has accordingly become critical. The United States Court of Appeals for the Ninth Circuit and the Supreme Court of the State of Washington have issued conflicting decisions on its meaning. In addition, their holdings raise important ancillary questions that will appear from a brief review of this extensive litigation.

The federal litigation was commenced in the United States District Court for the Western District of Washington in 1970. The United States, on its own behalf and as trustee for seven Indian tribes, brought suit against the State of Washington

---

eries did not commence in Puget Sound until the mid-1890's. The large-scale development of the commercial fishing industry in the last decades of the Nineteenth Century brought about the need for regulation of fish harvests." *Id.,* at 352 (record citations omitted). See also *id.,* at 406.

[14] The impact of illegal regulation, see *Tulee* v. *Washington,* 315 U. S. 681, and of illegal exclusionary tactics by non-Indians, see *United States* v. *Winans,* 198 U. S. 371, in large measure accounts for the decline of the Indian fisheries during this century and renders that decline irrelevant to a determination of the fishing rights the Indians assumed they were securing by initialing the treaties in the middle of the last century.

seeking an interpretation of the treaties and an injunction requiring the State to protect the Indians' share of the anadromous fish runs. Additional Indian tribes, the State's Fisheries and Game Departments, and one commercial fishing group, were joined as parties at various stages of the proceedings, while various other agencies and groups, including all of the commercial fishing associations that are parties here, participated as *amici curiae.* 384 F. Supp., at 327, 328, and n. 4; 459 F. Supp., at 1028.

During the extensive pretrial proceedings, four different interpretations of the critical treaty language were advanced. Of those, three proceeded from the assumption that the language required some allocation to the Indians of a share of the runs of fish passing through their traditional fishing areas each year. The tribes themselves contended that the treaties had reserved a pre-existing right to as many fish as their commercial and subsistence needs dictated. The United States argued that the Indians were entitled either to a 50% share of the "harvestable" fish that originated in and returned to the "case area" and passed through their fishing places,[15] or to their needs, whichever was less. The Department of Fisheries agreed that the Indians were entitled to "a fair and equitable share" stated in terms of a percentage of the harvestable salmon in the area; ultimately it proposed a share of "one-third."

Only the Game Department thought the treaties provided no assurance to the Indians that they could take some portion

---

[15] The "harvestable" amount of fish is determined by subtracting from the total number of fish in each run the number that must be allowed to escape for conservation purposes.

The "case area" was defined by the District Court as

"that portion of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, and includes the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas." 384 F. Supp., at 328.

of each run of fish. That agency instead argued that the treaties gave the Indians no fishing rights not enjoyed by non-treaty fishermen except the two rights previously recognized by decisions of this Court—the right of access over private lands to their usual and accustomed fishing grounds, see *Seufert Bros. Co.* v. *United States,* 249 U. S. 194; *United States* v. *Winans,* 198 U. S. 371, and an exemption from the payment of license fees. See *Tulee* v. *Washington,* 315 U. S. 681.

The District Court agreed with the parties who advocated an allocation to the Indians, and it essentially agreed with the United States as to what that allocation should be. It held that the Indians were then entitled to a 45% to 50% share of the harvestable fish that will at some point pass through recognized tribal fishing grounds in the case area.[16] The share was to be calculated on a river-by-river, run-by-run basis, subject to certain adjustments. Fish caught by Indians for ceremonial and subsistence purposes as well as fish caught within a reservation were excluded from the calculation of the tribes' share.[17] In addition, in order to compensate for fish caught outside of the case area, *i. e.,* beyond the State's jurisdiction, the court made an "equitable adjustment" to increase the allocation to the Indians. The court left it to the individual tribes involved to agree among themselves on how best to divide the Indian share of runs that pass through the usual and accustomed grounds of more than one tribe, and it postponed until a later date the proper accounting for hatchery-bred fish. 384 F. Supp., at 416–417; 459 F. Supp.,

---

[16] A factual dispute exists on the question of what percentage of the fish in the case area actually passes through Indian fishing areas and is therefore subject to the District Court's allocations. In the absence of any relevant findings by the courts below, we are unable to express any view on the matter.

[17] Moreover, fish caught by individual Indians at off-reservation locations that are not "usual and accustomed" sites, were treated as if they had been caught by nontreaty fishermen. 384 F. Supp., at 410.

at 1129. With a slight modification,[18] the Court of Appeals for the Ninth Circuit affirmed, 520 F. 2d 676, and we denied certiorari, 423 U. S. 1086.[19]

The injunction entered by the District Court required the Department of Fisheries (Fisheries) to adopt regulations protecting the Indians' treaty rights. 384 F. Supp., at 416–417. After the new regulations were promulgated, however, they were immediately challenged by private citizens in suits commenced in the Washington state courts. The State Supreme Court, in two cases that are here in consolidated form in No. 77–983, ultimately held that Fisheries could not comply with the federal injunction. *Puget Sound Gillnetters Assn.* v. *Moos,* 88 Wash. 2d 677, 565 P. 2d 1151 (1977); *Fishing Vessel Assn.* v. *Tollefson,* 89 Wash. 2d 276, 571 P. 2d 1373 (1977).

As a matter of federal law, the state court first accepted the Game Department's and rejected the District Court's interpretation of the treaties and held that they did not give the Indians a right to a share of the fish runs, and second concluded that recognizing special rights for the Indians would violate the Equal Protection Clause of the Fourteenth Amendment. The opinions might also be read to hold, as a matter of state

---

[18] The Court of Appeals held that fish caught by nonresidents of Washington should be eliminated from the equitable adjustment for fish caught beyond the State's jurisdiction. 520 F. 2d, at 689.

[19] Despite our earlier denial of certiorari on the treaty interpretation issue, we decline the Government's invitation to treat the matter as having been finally adjudicated. Our earlier denial came at an interlocutory stage in the proceedings—the District Court has retained continuing enforcement jurisdiction over the case—so that we certainly are not required to treat the earlier disposition as final for our purposes. *Reece* v. *Georgia,* 350 U. S. 85, 87. Moreover, the reason for our recent grant of certiorari on the question remains because the state courts are—and, at least since the State Supreme Court's decision in *Department of Game* v. *Puyallup Tribe,* 86 Wash. 2d 664, 548 P. 2d 1058 (1976), have been—on record as interpreting the treaties involved differently from the federal courts. Accordingly, there is strong reason not to treat it as final as a discretionary matter.

law, that Fisheries had no authority to issue the regulations because they had a purpose other than conservation of the resource.  In this Court, however, the Attorney General of the State disclaims the adequacy and independence of the state-law ground and argues that the state-law authority of Fisheries is dependent on the answers to the two federal-law questions discussed above.  Brief for State of Washington 99.  See n. 34, *infra*.  We defer to that interpretation, subject, of course, to later clarification by the State Supreme Court.  Because we are also satisfied that the constitutional holding is without merit,[20] our review of the state court's judgment will be limited to the treaty issue.

When Fisheries was ordered by the state courts to abandon its attempt to promulgate and enforce regulations in compliance with the federal court's decree—and when the Game Department simply refused to comply—the District Court entered a series of orders enabling it, with the aid of the United States Attorney for the Western District of Washington and various federal law enforcement agencies, directly to supervise those aspects of the State's fisheries necessary to the preservation of treaty fishing rights.  459 F. Supp. 1020.  The District Court's power to take such direct action and, in doing so, to enjoin persons who were not parties to the proceeding was affirmed by the United States Court of Appeals

---

[20] The Washington Supreme Court held that the treaties would violate equal protection principles if they provided fishing rights to Indians that were not also available to non-Indians.  The simplest answer to this argument is that this Court has already held that these treaties confer enforceable special benefits on signatory Indian tribes, *e. g., Tulee* v. *Washington,* 315 U. S. 681; *United States* v. *Winans,* 198 U. S. 317, and has repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when rationally related to the Government's "unique obligation toward the Indians." *Morton* v. *Mancari,* 417 U. S. 535, 555.  See *United States* v. *Antelope,* 430 U. S. 641; *Antoine* v. *Washington,* 420 U. S. 194.  See also *Fishing Vessel Assn.* v. *Tollefson,* 89 Wash. 2d 276, 287–288, 571 P. 2d 1373, 1379–1380 (1977) (Utter, J., dissenting).

for the Ninth Circuit. 573 F. 2d 1123. That court, in a separate opinion, 573 F. 2d 1118, also held that regulations of the International Pacific Salmon Fisheries Commission posed no impediment to the District Court's interpretation of the treaty language and to its enforcement of that interpretation. Subsequently, the District Court entered an enforcement order regarding the salmon fisheries for the 1978 and subsequent seasons, which, prior to our issuance of a writ of certiorari to review the case, was pending on appeal in the Court of Appeals. App. 486–490.

Because of the widespread defiance of the District Court's orders, this litigation has assumed unusual significance. We granted certiorari in the state and federal cases to interpret this important treaty provision and thereby to resolve the conflict between the state and federal courts regarding what, if any, right the Indians have to a share of the fish, to address the implications of international regulation of the fisheries in the area, and to remove any doubts about the federal court's power to enforce its orders. 439 U. S. 909.

## IV

The treaties secure a "right of taking fish." The pertinent articles provide:

> "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: *Provided, however,* That they shall not take shell fish from any beds staked or cultivated by citizens." [21]

---

[21] The language is quoted from Art. III of the Treaty of Medicine Creek, 10 Stat. 1133. Identical, or almost identical, language is included in each of the other treaties.

At the time the treaties were executed there was a great abundance of fish and a relative scarcity of people. No one had any doubt about the Indians' capacity to take as many fish as they might need. Their right to take fish could therefore be adequately protected by guaranteeing them access to usual and accustomed fishing sites which could be—and which for decades after the treaties were signed were—comfortably shared with the incoming settlers.

Because the sparse contemporaneous written materials refer primarily to assuring access to fishing sites "in common with all citizens of the Territory," the State of Washington and the commercial fishing associations, having all adopted the Game Department's original position, argue that it was merely access that the negotiators guaranteed. It is equally plausible to conclude, however, that the specific provision for access was intended to secure a greater right—a right to harvest a share of the runs of anadromous fish that at the time the treaties were signed were so plentiful that no one could question the Indians' capacity to take whatever quantity they needed. Indeed, a fair appraisal of the purpose of the treaty negotiations, the language of the treaties, and this Court's prior construction of the treaties, mandates that conclusion.

A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations. *E. g., Lone Wolf* v. *Hitchcock,* 187 U. S. 553. When the signatory nations have not been at war and neither is the vanquished, it is reasonable to assume that they negotiated as equals at arm's length. There is no reason to doubt that this assumption applies to the treaties at issue here. See 520 F. 2d, at 684.

Accordingly, it is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties. When Indians are involved, this Court has long given special meaning to this rule. It has held that the United States, as the party with the presumptively su-

perior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Jones* v. *Meehan,* 175 U. S. 1, 11. This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor. *Tulee* v. *Washington,* 315 U. S. 681; *Seufert Bros. Co.* v. *United States,* 249 U. S. 194; *United States* v. *Winans,* 198 U. S. 371. See also *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 484.

Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent. See *supra,* at 666–668. It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter "should be excluded from their ancient fisheries," see n. 9, *supra,* and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish. That each individual Indian would share an "equal opportunity" with thousands of newly arrived individual settlers is totally foreign to the spirit of the negotiations.[22] Such a "right,"

---

[22] The State characterizes its interpretation of the treaty language as assuring Indians and non-Indians an "equal opportunity" to take fish from the State's waters. This appellation is misleading. In the first place, even the State recognizes that the treaties provide Indians with certain rights—*i. e.,* the right to fish without a license and to cross private lands—that non-Indians do not have. See *Tulee* v. *Washington,* 315 U. S. 681; *Seufert Bros. Co.* v. *United States,* 249 U. S. 194; *United States* v. *Winans,* 198 U. S. 371. See also *Puyallup Tribe* v. *Washington Game*

along with the $207,500 paid the Indians, would hardly have been sufficient to compensate them for the millions of acres they ceded to the Territory.

It is true that the words "in common with" may be read either as nothing more than a guarantee that individual Indians would have the same right as individual non-Indians or as securing an interest in the fish runs themselves. If we were to construe these words by reference to 19th-century property concepts, we might accept the former interpretation, although even "learned lawyers" of the day would probably have offered differing interpretations of the three words.[23]

---

*Dept.*, 433 U. S. 165. Whatever opportunities the treaties assure Indians with respect to fish are admittedly not "equal" to, but are to some extent greater than, those afforded other citizens. It is therefore simply erroneous to suggest that the treaty language "confers upon non-Indians precisely the same right to fish that it confers upon Indians." POWELL, J., dissenting, *post*, at 698.

Moreover, in light of the far superior numbers, capital resources, and technology of the non-Indians, the concept of the Indians' "equal *opportunity*" to take advantage of a scarce resource is likely in practice to mean that the Indians' "right of taking fish" will net them virtually no catch at all. For the "opportunity" is at best theoretical. Indeed, in 1974, before the District Court's injunction took effect, and while the Indians were still operating under the "equal opportunity" doctrine, their take amounted to approximately 2% of the total harvest of salmon and trout in the treaty area. 459 F. Supp., at 1032.

[23] The State argues that at common law a "common fishery" was merely a nonexclusive right of access, see 3 J. Kent, Commentaries 412 (5th ed. 1844), and that the right of a fishery was appurtenant to specific parcels of real property. The State does not suggest, however, that these concepts were understood by, or explained to, the Indians. Indeed, there is no evidence that Governor Stevens understood them, although one of his advisers, George Gibbs, was a lawyer.

But even if we indulge in the highly dubious assumption that Gibbs was learned in the intricacies of water law, that he incorporated them in the treaties, and that he explained them fully to the Indians, the treaty language would still be subject to the different interpretations presented by the parties to this litigation. For in addition to "common fisheries," the "in common with" language was used in two other relevant senses

But we think greater importance should be given to the Indians' likely understanding of the other words in the treaties and especially the reference to the "right of *taking* fish"—a right that had no special meaning at common law but that must have had obvious significance to the tribes relinquishing a portion of their pre-existing rights to the United States in return for this promise. This language is particularly meaningful in the context of anadromous fisheries—which were not the focus of.the common law—because of the relative predictability of the "harvest." In this context, it makes sense to say that a party has a right to "take"—rather than merely the "opportunity" to try to catch—some of the large quantities of fish that will almost certainly be available at a given place at a given time.

This interpretation is confirmed by additional language in the treaties. The fishing clause speaks of "securing" certain fishing rights, a term the Court has previously interpreted as synonymous with "reserving" rights previously exercised. *Winans,* 198 U. S., at 381. See also *New York ex rel. Kennedy* v. *Becker,* 241 U. S. 556, 563–564. Because the Indians had al-

---

during the period. First, a "common *of* fishery" meant a limited right, acquired from the previously exclusive owner of certain fishing rights (in this case the Indians), "of taking fish *in common with* certain others in waters flowing through [the grantor's] land." J. Gould, Laws of Waters § 183 (3d ed. 1900) (emphasis added); see 3 Kent, *supra,* at 410. Under that understanding of the language, it would hardly make sense that the Indians effectively relinquished all of their fishing rights by granting a merely nonexclusive right.

Even more to the point, the United States had previously used the "in common with" language in two treaties with Britain, including one signed in 1854, that dealt with fishing rights in certain waters adjoining the United States and Canada. Treaty of Oct. 20, 1818, 8 Stat. 248; Treaty of June 5, 1854, 10 Stat. 1089. As interpreted by the Department of State during the 19th century, these treaties gave each signatory country an "equal" and apportionable "share" of the take of fish in the treaty areas. See H. R. Ex. Doc. No. 84, 46th Cong., 2d Sess., 7 (1880); 5 American State Papers (For. Rel.) 528–529 (1823); J. Q. Adams, The Duplicate Letters, The Fisheries and the Mississippi 184–185 (1822).

ways exercised the right to meet their subsistence and commercial needs by taking fish from treaty area waters, they would be unlikely to perceive a "reservation" of that right as merely the chance, shared with millions of other citizens, occasionally to dip their nets into the territorial waters. Moreover, the phrasing of the clause quite clearly avoids placing each individual Indian on an equal footing with each individual citizen of the State. The referent of the "said Indians" who are to share the right of taking fish with "all citizens of the Territory" is not the individual Indians but the various signatory "tribes and bands of Indians" listed in the opening article of each treaty. Because it was the tribes that were given a right in common with non-Indian citizens, it is especially likely that a class right to a share of fish, rather than a personal right to attempt to land fish, was intended.

In our view, the purpose and language of the treaties are unambiguous; they secure the Indians' right to take a share of each run of fish that passes through tribal fishing areas. But our prior decisions provide an even more persuasive reason why this interpretation is not open to question. For notwithstanding the bitterness that this litigation has engendered, the principal issue involved is virtually a "matter decided" by our previous holdings.

The Court has interpreted the fishing clause in these treaties on six prior occasions. In all of these cases the Court placed a relatively broad gloss on the Indians' fishing rights and—more or less explicitly—rejected the State's "equal opportunity" approach; in the earliest and the three most recent cases, moreover, we adopted essentially the interpretation that the United States is reiterating here.

In *United States* v. *Winans, supra,* the respondent, having acquired title to property on the Columbia River and having obtained a license to use a "fish wheel"—a device capable of catching salmon by the ton and totally destroying a run of fish—asserted the right to exclude the Yakimas from one of their "usual and accustomed" places. The Circuit

Court for the District of Washington sustained respondent, but this Court reversed. The Court initially rejected an argument that is analogous to the "equal opportunity" claim now made by the State:

"[I]t was decided [below] that the Indians acquired no rights but what any inhabitant of the Territory or State would have. Indeed, acquired no rights but such as they would have without the treaty. This is certainly an impotent outcome to negotiations and a convention; which seemed to promise more and give the word of the Nation for more. . . . How the treaty in question was understood may be gathered from the circumstances.

"The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them— a reservation of those not granted. And the form of the instrument and its language was adapted to that purpose. . . . There was an exclusive right to fishing reserved within certain boundaries. There was a right outside of those boundaries reserved 'in common with citizens of the Territory.' As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given 'the right of taking fish at all usual and accustomed places,' and the right 'of erecting temporary buildings for curing them.' The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other

words, the Indians were given a right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty." 198 U. S., at 380–381.

See also *Seufert Bros.*, 249 U. S., at 198, and *Tulee*, 315 U. S., at 684, both of which repeated this analysis, in holding that treaty Indians had rights, "beyond those which other citizens may enjoy," to fish without paying license fees in ceded areas and even in accustomed fishing places lying outside of the lands ceded by the Indians. See n. 22, *supra*.

But even more significant than the language in *Winans* is its actual disposition. The Court not only upheld the Indians' right of access to respondent's private property but also ordered the Circuit Court on remand to devise some "adjustment and accommodation" that would protect them from total exclusion from the fishery. 198 U. S., at 384. Although the accommodation it suggested by reference to the Solicitor General's brief in the case is subject to interpretation, it clearly included removal of enough of the fishing wheels to enable some fish to escape and be available to Indian fishermen upstream. Brief for United States, O. T. 1904, No. 180, pp. 54–56. In short, it assured the Indians a share of the fish.

In the more recent litigation over this treaty language between the Puyallup Tribe and the Washington Department of Game,[24] the Court in the context of a dispute over rights to the run of steelhead trout on the Puyallup River reaffirmed both of the holdings that may be drawn from *Winans*—the treaty guarantees the Indians more than simply the "equal opportunity" along with all of the citizens of the State to catch fish, and it in fact assures them some portion of each

---

[24] *Puyallup Tribe* v. *Washington Game Dept.*, 391 U. S. 392 (*Puyallup I*); *Washington Game Dept.* v. *Puyallup Tribe*, 414 U. S. 44 (*Puyallup II*); and *Puyallup Tribe* v. *Washington Game Dept.*, 433 U. S. 165 (*Puyallup III*).

relevant run. But the three *Puyallup* cases are even more explicit; they clearly establish the principle that neither party to the treaties may rely on the State's regulatory powers or on property law concepts to defeat the other's right to a "fairly apportioned" share of each covered run of harvestable anadromous fish.

In *Puyallup I,* the Court sustained the State's power to impose nondiscriminatory regulations on treaty fishermen so long as they were "necessary" for the conservation of the various species. In so holding, the Court again explicitly rejected the equal-opportunity theory. Although nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation.[25]

When the Department of Game sought to impose a total ban on commercial net fishing for steelhead, the Court held in *Puyallup II* that such regulation was not a "reasonable and necessary conservation measure" and would deny the Indians

---

[25] Mr. Justice Douglas wrote for the Court:

"The right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State . . . . But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." 391 U. S., at 398.

In describing the "appropriate standards" referred to, Mr. Justice Douglas continued:

"As to a 'regulation' concerning the time and manner of fishing . . . , the power of the State [is] measured by whether [the regulation is] 'necessary for the conservation of fish.' [*Tulee,*] 315 U. S., at 684.

"The measure of the legal propriety of those kinds of conservation measures is therefore distinct from the federal constitutional standard concerning the scope of the police power of a State. See *Ferguson* v. *Skrupa,* 372 U. S. 726 . . . ." *Id.,* at 402 n. 14.

See also *Antoine* v. *Washington,* 420 U. S., at 207–208; *Tulee,* 315 U. S., at 684; *Winans,* 198 U. S., at 384; *Ward* v. *Race Horse,* 163 U. S. 504.

their "fairly apportioned" share of the Puyallup River run. 414 U. S. 44, 45, 48. Although under the challenged regulation every individual fisherman would have had an equal opportunity to use a hook and line to land the steelhead, most of the fish would obviously have been caught by the 145,000 nontreaty licensees rather than by the handful of treaty fishermen. This Court vindicated the Indians' treaty right to "take fish" by invalidating the ban on Indian net fishing and remanding the case with instructions to the state courts to determine the portion of harvestable steelhead that should be allocated to net fishing by members of the tribe. *Id.*, at 48–49. Even if *Winans* had not already done so, this unanimous holding foreclosed the basic argument that the State is now advancing.

On remand, the Washington state courts held that 45% of the steelhead run was allocable to commercial net fishing by the Indians. We shall later discuss how that specific percentage was determined; what is material for present purposes is the recognition, upheld by this Court in *Puyallup III*, that the treaty secured the Tribe's right to a substantial portion of the run, and not merely a right to compete with nontreaty fishermen on an individual basis.[26]

*Puyallup III* also made it clear that the *Indians* could not rely on their treaty right to exclude others from access to certain fishing sites to deprive other citizens of the State of a "fair apportionment" of the runs. For although it is clear that the Tribe may exclude non-Indians from access to fishing

---

[26] Although some members of the Washington Supreme Court in their opinions in *Puyallup III* expressed the view that the treaties could not be interpreted as affording treaty fishermen an allocable share of the fish, *Department of Game* v. *Puyallup Tribe*, 86 Wash. 2d, at 674–681, 548 P. 2d, at 1066–1070; see *id.*, at 690–698, 548 P. 2d, at 1075–1080 (Rosellini, J., concurring); but see *id.*, at 688–690, 548 P. 2d, at 1074–1075 (Stafford, C. J., concurring in result), they recognized that any other interpretation would be inconsistent with "the express language on the face of [this Court's decision in] *Puyallup II* . . . ."

within the reservation, we unequivocally rejected the Tribe's claim to an untrammeled right to take as many of the steelhead running through its reservation as it chose. In support of our holding that the State has regulatory jurisdiction over on-reservation fishing, we reiterated Mr. Justice Douglas' statement for the Court in *Puyallup II* that the "Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets." 414 U. S., at 49. It is in this sense that treaty and nontreaty fishermen hold "equal" rights. For neither party may deprive the other of a "fair share" of the runs.

Not only all six of our cases interpreting the relevant treaty language but all federal courts that have interpreted the treaties in recent times have reached the foregoing conclusions, see *Sohappy* v. *Smith,* 302 F. Supp. 899, 908, 911 (Ore. 1969) (citing cases), as did the Washington Supreme Court itself prior to the present litigation. *State* v. *Satiacum,* 50 Wash. 2d 513, 523–524, 314 P. 2d 400, 406 (1957). A like interpretation, moreover, has been followed by the Court with respect to hunting rights explicitly secured by treaty to Indians " 'in common with all other persons,' " *Antoine* v. *Washington,* 420 U. S. 194, 205–206, and to water rights that were merely implicitly secured to the Indians by treaties reserving land— treaties that the Court enforced by ordering an apportionment to the Indians of enough water to meet their subsistence and cultivation needs. *Arizona* v. *California,* 373 U. S. 546, 598–601, following *United States* v. *Powers,* 305 U. S. 527, 528–533; *Winters* v. *United States,* 207 U. S. 564, 576.

The purport of our cases is clear. Nontreaty fishermen may not rely on property law concepts, devices such as the fish wheel, license fees, or general regulations to deprive the Indians of a fair share of the relevant runs of anadromous fish in the case area. Nor may treaty fishermen rely on their exclusive right of access to the reservations to destroy the rights of other "citizens of the Territory." Both sides have

a right, secured by treaty, to take a fair share of the available fish. That, we think, is what the parties to the treaty intended when they secured to the Indians the right of taking fish in common with other citizens.

## V

We also agree with the Government that an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount. Although this method of dividing the resource, unlike the right to *some* division, is not mandated by our prior cases, it is consistent with the 45%–55% division arrived at by the Washington state courts, and affirmed by this Court, in *Puyallup III* with respect to the steelhead run on the Puyallup River. The trial court in the *Puyallup* litigation reached those figures essentially by starting with a 50% allocation based on the Indians' reliance on the fish for their livelihoods and then adjusting slightly downward due to other relevant factors. App. to Pet. for Cert. in *Puyallup III,* O. T. 1976, No. 76–423, pp. C–56 to C–57. The District Court took a similar tack in this case, *i. e.,* by starting with a 50–50 division and adjusting slightly downward on the Indians' side when it became clear that they did not need a full 50%. 384 F. Supp., at 402, 416–417; 459 F. Supp., at 1101; 573 F. 2d, at 1129.

The division arrived at by the District Court is also consistent with our earlier decisions concerning Indian treaty rights to scarce natural resources. In those cases, after determining that at the time of the treaties the resource involved was necessary to the Indians' welfare, the Court typically ordered a trial judge or special master, in his discretion, to devise some apportionment that assured that the Indians' reasonable livelihood needs would be met. *Arizona*

v. *California, supra,* at 600; *Winters, supra.* See *Winans,* 198 U. S., at 384. This is precisely what the District Court did here, except that it realized that some ceiling should be placed on the Indians' apportionment to prevent their needs from exhausting the entire resource and thereby frustrating the treaty right of "all [other] citizens of the Territory."

Thus, it first concluded that at the time the treaties were signed, the Indians, who comprised three-fourths of the territorial population, depended heavily on anadromous fish as a source of food, commerce, and cultural cohesion. Indeed, it found that the non-Indian population depended on Indians to catch the fish that the former consumed. See *supra,* at 664–669, and n. 7. Only then did it determine that the Indians' present-day subsistence and commercial needs should be met, subject, of course, to the 50% ceiling. 384 F. Supp., at 342–343.

It bears repeating, however, that the 50% figure imposes a maximum but not a minimum allocation. As in *Arizona* v. *California* and its predecessor cases, the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living. Accordingly, while the maximum possible allocation to the Indians is fixed at 50%,[27] the minimum is not; the latter

---

[27] Because the 50% figure is only a ceiling, it is not correct to characterize our holding "as guaranteeing the Indians a specified percentage" of the fish. See POWELL, J., dissenting, *post,* at 697.

The logic of the 50% ceiling is manifest. For an equal division—especially between parties who presumptively treated with each other as equals—is suggested, if not necessarily dictated, by the word "common" as it appears in the treaties. Since the days of Solomon, such a division has been accepted as a fair apportionment of a common asset, and Anglo-American common law has presumed that division when, as here, no other percentage is suggested by the language of the agreement or the surrounding circumstances. *E. g.,* 2 American Law of Property § 6.5, p. 19 (A. Casner ed. 1952); E. Hopkins, Handbook on the Law of Real Property § 209, p. 336 (1896).

will, upon proper submissions to the District Court, be modified in response to changing circumstances. If, for example, a tribe should dwindle to just a few members, or if it should find other sources of support that lead it to abandon its fisheries, a 45% or 50% allocation of an entire run that passes through its customary fishing grounds would be manifestly inappropriate because the livelihood of the tribe under those circumstances could not reasonably require an allotment of a large number of fish.

Although the District Court's exercise of its discretion, as slightly modified by the Court of Appeals, see n. 18, *supra*, is in most respects unobjectionable, we are not satisfied that all of the adjustments it made to its division are consistent with the preceding analysis.

The District Court determined that the fish taken by the Indians on their reservations should not be counted against their share. It based this determination on the fact that Indians have the exclusive right under the treaties to fish on their reservations. But this fact seems to us to have no greater significance than the fact that some nontreaty fishermen may have exclusive access to fishing sites that are not "usual and accustomed" places. Shares in the fish runs should not be affected by the place where the fish are taken. Cf. *Puyallup III*, 433 U. S., at 173–177.[28] We therefore disagree with the District Court's exclusion of the Indians' on-reservation catch from their portion of the runs.[29]

---

[28] This Court's decision in *Puyallup III*, which approved state regulation of on-reservation fishing in the interest of conservation, was issued after the District Court excluded the Indians' on-reservation take and the Court of Appeals affirmed. See 520 F. 2d, at 690.

[29] A like reasoning requires the fish taken by treaty fishermen off the reservations and at locations other than "usual and accustomed" sites, see n. 17, *supra*, to be counted as part of the Indians' share. Of course, the District Court, in its discretion, may determine that so few fish fit into this, or any other, category (e. g., "take-home" fish caught by nontreaty commercial fishermen for personal use) that accounting for them individ-

This same rationale, however, validates the Court-of-Appeals-modified equitable adjustment for fish caught outside the jurisdiction of the State by nontreaty fishermen from the State of Washington. See n. 18, *supra,* and accompanying text. So long as they take fish from identifiable runs that are destined for traditional tribal fishing grounds, such persons may not rely on the location of their take to justify excluding it from their share. Although it is true that the fish involved are caught in waters subject to the jurisdiction of the United States, rather than of the State, see 16 U. S. C. §§ 1811, 1812, the persons catching them are nonetheless "citizens of the Territory" and as such the beneficiaries of the Indians' reciprocal grant of land in the treaties as well as the persons expressly named in the treaties as sharing fishing rights with the Indians. Accordingly, they may justifiably be treated differently from nontreaty fishermen who are not citizens of Washington. The statutory provisions just cited are therefore important in this context only because they clearly place a responsibility on the United States, rather than the State, to police the take of fish in the relevant waters by Washington citizens insofar as is necessary to assure compliance with the treaties.

On the other hand, as long as there are enough fish to satisfy the Indians' ceremonial and subsistence needs, we see no justification for the District Court's exclusion from the treaty share of fish caught for these purposes. We need not now decide whether priority for such uses would be required in a period of short supply in order to carry out the purposes of the treaty. See 384 F. Supp., at 343. For present purposes, we merely hold that the total catch—rather than the commercial catch—is the measure of each party's right.[30]

---

ually is unnecessary, and that an estimated figure may be relied on in making the annual computation. Indeed, if the amount is truly *de minimis,* no accounting at all may be required.

[30] The Government suggests that the District Court's exclusion of the "take-home" catch of nontreaty fishermen from the nontreaty share

Accordingly, any fish (1) taken in Washington waters or in United States waters off the coast of Washington, (2) taken from runs of fish that pass through the Indians' usual and accustomed fishing grounds, and (3) taken by either members of the Indian tribes that are parties to this litigation, on the one hand, or by non-Indian citizens of Washington, on the other hand, shall count against that party's respective share of the fish.

## VI

Regardless of the Indians' other fishing rights under the treaties, the State argues that an agreement between Canada and the United States pre-empts their rights with respect to the sockeye and pink salmon runs on the Fraser River.

In 1930, the United States and Canada agreed that the catch of Fraser River salmon should be equally divided between Canadian and American fishermen. Convention of May 26, 1930, 50 Stat. 1355, as amended by [1957] 8 U. S. T. 1058. To implement this agreement, the two Governments established the International Pacific Salmon Fisheries Commission (IPSFC). Each year that Commission proposes regulations to govern the time, manner, and number of the catch by the fishermen of the two countries; those regulations become effective upon approval of both countries.

In the United States, pursuant to statute and Presidential designation, enforcement of those regulations is vested in the

---

makes up for any losses to those fishermen occasioned by the exclusion of the Indians' ceremonial and subsistence take. We see nothing in the District Court's findings to verify this allegation, see 384 F. Supp., at 343, although the District Court may wish to address the issue in this light on remand.

Although there is some discussion in the briefs concerning whether the treaties give Indians the same right to take hatchery-bred fish as they do to take native fish, the District Court has not yet reached a final decision on this issue, see 459 F. Supp., at 1072–1085, and it is not therefore fairly subsumed within our grant of certiorari. See *Puyallup III,* 433 U. S., at 177 n. 17.

National Marine Fisheries Service, which, in turn, may authorize the State of Washington to act as the enforcing agent. Sockeye Salmon or Pink Salmon Fishing Act of 1947, 61 Stat. 511, as amended, 16 U. S. C. § 776 *et seq.* (hereinafter Sockeye Act). For many years Washington has accepted this responsibility and enacted IPSFC regulations into state statutory law.

The Fraser River salmon run passes through certain "usual and accustomed" places of treaty tribes. The Indians have therefore claimed a share of these runs. Consistently with its basic interpretation of the Indian treaties, the District Court in its original decision held that the tribes are entitled to up to one-half of the American share of any run that passes through their "usual and accustomed" places. To implement that holding, the District Court also entered an order authorizing the use by Indians of certain gear prohibited by IPSFC regulations then in force. 384 F. Supp., at 392–393, 411. The Court of Appeals affirmed, 520 F. 2d, at 689–690, and we denied certiorari. 423 U. S. 1086.

In later proceedings commenced in 1975, the State of Washington contended in the District Court that any Indian rights to Fraser River salmon were extinguished either implicitly by the later agreement with Canada or more directly by the IPSFC regulations promulgated pursuant to those agreements insofar as they are inconsistent with the District Court's order. The State's claim was rejected by the District Court and the Court of Appeals. 459 F. Supp., at 1050–1056; 573 F. 2d, at 1120–1121.

First, we agree with the Court of Appeals that the Convention itself does not implicitly extinguish the Indians' treaty rights. Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights, *e. g., Menominee Tribe* v. *United States,* 391 U. S. 404, and there is no reason to do so here. Indeed, the Canadian Government has long exempted Canadian Indians from regu-

lations promulgated under the Convention and afforded them special fishing rights.

We also agree with the United States that the conflict between the District Court's order and IPSFC does not present us with a justiciable issue. The initial conflict occasioned by the regulations for the 1975 season has been mooted by the passage of time, and there is little prospect that a similar conflict will revive and yet evade review. See *DeFunis* v. *Odegaard,* 416 U. S. 312, 316. Since 1975, the United States, in order to protect the Indian rights, has exercised its power under Art. VI of the Convention and refused to give the necessary approval to those portions of the IPSFC regulations that affected Indian fishing rights. Those regulations have accordingly not gone into effect in the United States. The Indians' fishing rights and responsibilities have instead been the subject of separate regulations promulgated by the Interior Department, under its general Indian powers, 25 U. S. C. §§ 2, 9; see 25 CFR § 256.11 *et seq.* (1978); 50 CFR § 371.1 *et seq.* (1978); 25 CFR § 256.11 *et seq.* (1979), and enforced by the National Marine Fisheries Service directly, rather than by delegation to the State. The District Court's order is fully consistent with those regulations.[31] To the extent that any Washington State statute imposes any conflicting obligations, the statute is without effect under the Sockeye Act and

---

[31] Although the IPSFC has refused to accede to the suggestions of the United States that special regulations be promulgated to cover the Indian fisheries, we are informed by the Solicitor General that the Canadian Government has no objection to those suggestions, has unilaterally implemented similar rules on behalf of its own Indians, and has expressed no dissatisfaction with the unilateral actions taken by the United States in this regard. Brief for United States 40 n. 26.

Because the Department of the Interior regulations assure that no disproportion will occur, the equitable adjustment ordered by the District Court to cover the possibility that IPSFC regulations would result in a disproportionate nontreaty take will not be effectuated. We accordingly have no issue before us concerning the validity of that adjustment.

must give way to the federal treaties, regulations, and decrees. *E. g., Missouri* v. *Holland,* 252 U. S. 416, 432.

## VII

In addition to their challenges to the District Court's basic construction of the treaties, and to the scope of its allocation of fish to treaty fishermen, the State and the commercial fishing associations have advanced two objections to various remedial orders entered by the District Court.[32] It is claimed that

---

[32] The associations advance a third objection as well—that the District Court had no power to enjoin individual nontreaty fishermen, who were not parties to its decisions, from violating the allocations that it has ordered. The reason this issue has arisen is that state officials were either unwilling or unable to enforce the District Court's orders against nontreaty fishermen by way of state regulations and state law enforcement efforts. Accordingly, nontreaty fishermen were openly violating Indian fishing rights, and, in order to give federal law enforcement officials the power via contempt to end those violations, the District Court was forced to enjoin them. 459 F. Supp., at 1043, 1098–1099, 1113–1117. The commercial fishing organizations, on behalf of their individual members, argue that they should not be bound by these orders because they were not parties to (although the associations all did participate as *amici curiae* in) the proceedings that led to their issuance.

If all state officials stand by the Attorney General's representations that the State will implement the decision of this Court, see nn. 34 and 35, *infra,* this issue will be rendered moot because the District Court no longer will be forced to enforce its own decisions. Nonetheless, the issue is still live since state implementation efforts are now at a standstill and the orders are still in effect. Accordingly, we must decide it.

In our view, the commercial fishing associations and their members are probably subject to injunction under either the rule that nonparties who interfere with the implementation of court orders establishing public rights may be enjoined, *e. g., United States* v. *Hall,* 472 F. 2d 261 (CA5 1972), cited approvingly in *Golden State Bottling Co.* v. *NLRB,* 414 U. S. 168, 180, or the rule that a court possessed of the res in a proceeding *in rem,* such as one to apportion a fishery, may enjoin those who would interfere with that custody. See *Vendo Co.* v. *Lektro-Vend Corp.,* 433 U. S. 623, 641. But in any case, these individuals and groups are citizens of the State of Washington, which was a party to the relevant proceedings, and "they, in their common public rights as citizens of the State, were represented by

the District Court has ordered a state agency to take action that it has no authority to take as a matter of state law and that its own assumption of the authority to manage the fisheries in the State after the state agencies refused or were unable to do so was unlawful.[33]

These objections are difficult to evaluate in view of the representations to this Court by the Attorney General of the State that definitive resolution of the basic federal question of construction of the treaties will both remove any state-law impediment to enforcement of the State's obligations under the treaties,[34] and enable the State and Fisheries to carry

the State in those proceedings, and, like it, were bound by the judgment." *Tacoma* v. *Taxpayers*, 357 U. S. 320, 340–341. Moreover, a court clearly may order them to obey that judgment. See *Golden State Bottling*, *supra*, at 179–180.

[33] The State has also argued that absent congressional legislation the treaties involved here are not enforceable. This argument flies directly in the face of Art. XIII of the treaties which states that they "shall be obligatory on the contracting parties as soon as [they are] ratified by the President and Senate of the United States." Moreover, the argument was implicitly rejected in *Winans* and our ensuing decisions regarding these treaties, all of which assumed that the treaties are self-enforcing. *E. g.*, *Puyallup I*, 391 U. S., at 397–398.

Significantly, Congress thrice rejected efforts in the early 1960's to terminate the Indians' fishing rights under these treaties. See S. J. Res. 170 and 171, 88th Cong., 2d Sess. (1964); H. J. Res. 48, 88th Cong., 1st Sess. (1963); H. J. Res. 698, 87th Cong., 2d Sess. (1962).

[34] In his brief, the Attorney General represented:

"If this Court now concludes that Indian treaty fishermen and all other fishermen are not members of the same class with respect to an allocation of fishery, it will thereby lay the foundation for the validity under state law of a separate classification of treaty Indian fishermen for the purpose of allocation. We would respectfully submit that if the Court rejects our earlier argument and finds that treaty Indian fishermen are a special class for allocation purposes, such a conclusion would remove the impediment found by the Washington Supreme Court to the exercise of necessary regulatory power by the Department of Fisheries to allocate between Indian and non-Indian fishermen.

. . . . .

"Fisheries will be able to comply with the Court's decision in this

out those obligations.[35] Once the state agencies comply, of course, there would be no issue relating to federal authority to order them to do so or any need for the District Court to continue its own direct supervision of enforcement efforts.

The representations of the Attorney General are not binding on the courts and legislature of the State, although we assume they are authoritative within its executive branch. Moreover, the State continues to argue that the District Court exceeded its authority when it assumed control of the fisheries in the State, and the commercial fishing groups

---

case even if it requires some type of allocation of the fishery." Brief for State of Washington 99.

See also *Department of Game* v. *Puyallup Tribe,* 86 Wash. 2d 664, 681, 684–688, 548 P. 2d 1058, 1070, 1072–1074 (1976), in which the Washington Supreme Court held that the Department of Game had authority to allocate a certain portion of the steelhead trout run on the Puyallup River to treaty fishermen.

[35] According to the Attorney General:

"The State of Washington and its Department of Fisheries cannot emphasize too strongly that they do not propose to inhibit the enforcement of proper federal court orders. . . .

.        .        .        .        .

"Whatever the decision of this Court, the state will implement it. The state believes that after a decision by this Court it will be in a position to comply with District Court orders, if the same are necessary to comply with this Court's decision. We do not believe the state courts could or would take a different point of view: We are confident that they will accede to this Court's interpretation of the treaties in the future just as they have in the past, as this Court expressly found in *Puyallup III,* [433 U. S.,] at 177." Brief for State of Washington 95, 96.

We note the omission of the same firm representation on behalf of the Game Department. Although the history of that agency is not nearly as favorable as that of Fisheries with respect to attempting to comply with the District Court's order, *e. g.,* 384 F. Supp., at 395, 398; 459 F. Supp., at 1043, 1045, 1099, we assume that this omission stems from the fact that only Fisheries was named as a party in the litigation in the state courts regarding the state agencies' authority to comply with the District Court's order. See 88 Wash. 2d, at 679, 565 P. 2d, at 1152. See also *Department of Game* v. *Puyallup Tribe,* discussed in n. 34, *supra.*

continue to argue that the District Court may not order the state agencies to comply with its orders when they have no state-law authority to do so. Accordingly, although adherence to the Attorney General's representations by the executive, legislative, and judicial officials in the State would moot these two issues, a brief discussion should foreclose the possibility that they will not be respected. State-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution. *Cooper* v. *Aaron,* 358 U. S. 1; *Ableman* v. *Booth,* 21 How. 506. It is also clear that Game and Fisheries, as parties to this litigation, may be ordered to prepare a set of rules that will implement the Court's interpretation of the rights of the parties even if state law withholds from them the power to do so. *E. g., North Carolina Board of Education* v. *Swann,* 402 U. S. 43; *Griffin* v. *County School Board,* 377 U. S. 218; *Tacoma* v. *Taxpayers,* 357 U. S. 320. Once again the answer to a question raised by this litigation is largely dictated by our *Puyallup* trilogy. There, this Court mandated that state officers make precisely the same type of allocation of fish as the District Court ordered in this case. See *Puyallup III,* 433 U. S., at 177.

Whether Game and Fisheries may be ordered actually to promulgate regulations having effect as a matter of state law may well be doubtful. But the District Court may prescind that problem by assuming direct supervision of the fisheries if state recalcitrance or state-law barriers should be continued. It is therefore absurd to argue, as do the fishing associations, both that the state agencies may not be ordered to implement the decree and also that the District Court may not itself issue detailed remedial orders as a substitute for state supervision. The federal court unquestionably has the power to enter the various orders that state official and private parties have chosen to ignore, and even to displace local enforcement of those orders if necessary to remedy the violations of

federal law found by the court. *E. g., Hutto* v. *Finney,* 437 U. S. 678; *Milliken* v. *Bradley,* 433 U. S. 267, 280–281, 290; *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15. Even if those orders may have been erroneous in some respects, all parties have an unequivocal obligation to obey them while they remain in effect.

In short, we trust that the spirit of cooperation motivating the Attorney General's representation will be confirmed by the conduct of state officials. But if it is not, the District Court has the power to undertake the necessary remedial steps and to enlist the aid of the appropriate federal law enforcement agents in carrying out those steps. Moreover, the comments by the Court of Appeals strongly imply that it is prepared to uphold the use of stern measures to require respect for federal-court orders.[36]

The judgments of the Court of Appeals for the Ninth Circuit and the Supreme Court of the State of Washington are vacated and the respective causes are remanded to those courts for further proceedings not inconsistent with this opinion, except that the judgment in *United States* v. *Washington,* 573 F. 2d 1118 (the *International Fisheries* case) is affirmed.

*So ordered.*

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, dissenting in part.

I join Parts I–III of the Court's opinion. I am not in agreement, however, with the Court's interpretation of the treaties

---

[36] "The state's extraordinary machinations in resisting the [1974] decree have forced the district court to take over a large share of the management of the state's fishery in order to enforce its decrees. Except for some desegregation cases . . . , the district court has faced the most concerted official and private efforts to frustrate a decree of a federal court witnessed in this century. The challenged orders in this appeal must be reviewed by this court in the context of events forced by litigants who offered the court no reasonable choice." 573 F. 2d 1123, 1126 (CA9 1978).

negotiated in 1854 and 1855 with the Indians of the Washington Territory. The Court's opinion, as I read it, construes the treaties' provision "of taking fish . . . in common" as guaranteeing the Indians a specified percentage of the runs of the anadromous fish passing land upon which the Indians traditionally have fished. Indeed, it takes as a starting point for determining fishing rights an equal division of these fish between Indians and non-Indians. *Ante,* at 685 *et seq.* As I do not believe that the language and history of the treaties can be construed to support the Court's interpretation, I dissent.

## I

At issue in these cases is the meaning of language found in six similar Indian treaties negotiated and signed in 1854 and 1855.[1] Each of the treaties provides substantially that "[t]*he right of taking fish,* at all usual and accustomed grounds and stations, is further secured to said Indians, *in common with all citizens of the Territory,* and of erecting temporary houses for the purpose of curing."[2] The question before us is whether this "common" fishing right is a right only of access to usual and accustomed fishing sites for the purpose of fishing there, or includes the greater right to exclude others from taking a particular portion of the fish that pass through the sites. As the Court observes, at the time the treaties were signed there was no need to address this question, for the surfeit of fish made lack of access to fishing areas the only constraint upon supply. Nonetheless, I believe that the compelling inference to be drawn from the language and history of the treaties is that the Indians sought and retained only the right to go to

---

[1] Treaty of Medicine Creek, 10 Stat. 1132; Treaty of Point Elliott, 12 Stat. 927; Treaty of Point No Point, 12 Stat. 933; Treaty with the Makahs, 12 Stat. 939; Treaty with the Yakamas, 12 Stat. 951; Treaty of Olympia, 12 Stat. 971.

[2] Treaty of Medicine Creek, 10 Stat. 1133 (emphasis supplied). There were some slight, immaterial variations in the language used. See, *e. g.,* Treaty with the Yakamas, quoted *infra,* at 698.

their accustomed fishing places and there to fish along with non-Indians. In addition, the Indians retained the exclusive right to take fish on their reservations, a right not involved in this litigation. In short, they have a right of access to fish.

Nothing in the language of the treaties indicates that any party understood that constraints would be placed on the amount of fish that anyone could take, or that the Indians would be guaranteed a percentage of the catch. Quite to the contrary, the language confers upon non-Indians precisely the same right to fish that it confers upon Indians, even in those areas where the Indians traditionally had fished. *United States* v. *Winans*, 198 U. S. 371 (1905). As it cannot be argued that Congress intended to guarantee non-Indians any specified percentage of the available fish, there is neither force nor logic to the argument that the same language— the "right of taking fish"—does guarantee such a percentage to Indians.

This conclusion is confirmed by the language used in the treaty negotiated with the Yakima Tribe, which explicitly includes what apparently is implicit in each of the treaties: the Indians' right to take fish on their reservations is exclusive. Thus, the Yakima Treaty provides that "[t]he exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory . . . ." 12 Stat. 953. There is no reason apparent from the language used in the treaties why the "right of taking fish" should mean one thing for purposes of the exclusive right of reservation fishing and quite another for purposes of the "common" right of fishing at usual and accustomed places. Since the Court interprets the right of taking fish in common to be an entitlement to half of the entire catch taken from fisheries passing the Indians' traditional fishing grounds, it therefore should follow that the

Court would interpret the exclusive right of taking fish to be an entitlement to *all* of the fish taken from fisheries passing the Indians' reservations. But the Court apparently concedes that this exclusive right is not of such Draconian proportions. Indeed, the Court would reduce the Indians' 50% portion by those fish caught on the reservation. The more reasonable conclusion, therefore, is that when the Indians and Governor Stevens agreed upon a "right of taking fish," they understood this right to be one of access to fish—exclusive access with respect to fishing places on the reservation, and common access with respect to fishing places off the reservation.[3]

In addition to the language of the treaties, the historical setting in which they were negotiated supports the inference that the fishing rights secured for the Indians were rights of access alone. The primary purpose of the six treaties negotiated by Governor Stevens was to resolve growing disputes between the settlers claiming title to land in the Washington Territory under the Land Donation Act of 1850, 9 Stat. 437, and the Indians who had occupied the land for generations. Under the bargain struck in the treaties, the Indians ceded their claims to vast tracts of land, retaining only certain specified areas as reservations, where they would have exclusive rights of possession and use. In exchange, the Indian tribes were given substantial sums of money and were promised various forms of aid. See, *e. g.,* Treaty of Medicine Creek, '10 Stat. 1132. By thus separating the Indians from the settlers it was hoped that friction could be minimized.

---

[3] Indeed, if the Court's interpretation of the treaties were correct, then the exclusive right with respect to reservation fishing would be largely superfluous. If the Indians had the right to 50%, and no more, of the fish irrespective of where they are caught, then it hardly would be of any great value to them that they could keep others from taking fish from locations on the reservation. The most reasonable way to interpret the exclusive right of reservation fishing so that it was of value, therefore, is as a special right of access.

The negotiators apparently realized, however, that restricting the Indians to relatively small tracts of land might interfere with their securing food. See letter of George Gibbs to Captain M'Clellan, App. 326 ("[The Indians] require the liberty of motion for the purpose of seeking, in their proper season, roots, berries, and fish"). This necessary "liberty of motion" was jeopardized by the title claims of the settlers whose land abutted—or would abut—the waterways from which fish traditionally had been caught. Thus, in Governor Stevens' report to the Commissioner of Indian Affairs, he noted the tension between the land rights afforded settlers under the 1850 Land Donation Act and the Indians' need to have some access to the fisheries. Although he expressed the view that "[i]t never could have been the intention of Congress that Indians should be excluded from their ancient fisheries," he noted that "no condition to this effect was inserted in the donation act," and therefore recommended the question "should be set at rest by law." Report of Governor Stevens to the Commissioner of Indian Affairs, App. 327. Viewed within this historical context, the common fishing right reserved to the Indians by the treaties of 1854 and 1855 could only have been the right, over and above their exclusive fishing right on their reservations, to roam off the reservations in order to reach fish at the locations traditionally used by the Indians for this purpose. On the other hand, there is no historical indication that any of the parties to the treaties understood that the Indians would be specifically guaranteed some set portion of the fisheries to which they traditionally had had access.

## II

Prior decisions of this Court have prevented the dilution of these treaty rights, but none has addressed the issue now before us. I read these decisions as supporting the interpretation set forth above. This is particularly true of *United States* v. *Winans, supra,* the case most directly relevant. In

that case a settler had constructed several fish wheels in the Columbia River. These fish wheels were built at locations where the Indians traditionally had fished, and " 'necessitate[d] the exclusive possession of the space occupied by the wheels,' " 198 U. S., at 380, thereby interfering with the Indians' treaty right of access to fish. This Court reviewed in some detail the precise nature of the Indians' fishing rights under the Yakima Treaty, and concluded:

> "[The treaties] reserved rights . . . to every individual Indian, as though named therein. They imposed a servitude upon every piece of land as though described therein. There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved 'in common with citizens of the Territory.' As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given 'the right of taking fish at all usual and accustomed places,' and the right 'of erecting temporary buildings for curing them.' The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other words, *the Indians were given a right in the land—the right of crossing it to the river*—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty." *Id.,* at 381 (emphasis added).

The Court thus viewed these treaties as intended to "giv[e] a right in the land"—a "servitude" upon all non-Indian land—to enable Indians to fish "in common with citizens of the Territory." The focus was on access to the traditional fishing areas for the purpose of enjoying the "right of fishing." *Ibid.* The *Winans* Court concluded, on the facts before it, that the right of access to fish in these areas had been abridged. It stated that "[i]n the actual taking of

fish white men may not be confined to a spear or crude net, but it does not follow that they may construct and use a device which gives them *exclusive possession of the fishing places,* as it is admitted a fish wheel does." *Id.,* at 382 (emphasis added). Thus, *Winans* was decided solely upon the basis of a treaty-secured right of access to fish. Moreover, the Court's analysis of the treaty right at issue in *Winans* strongly indicates that nothing more than a right of access fairly could be inferred from the treaty.[4]

Nor do the *Puyallup* cases interpret the treaties to require that any specified proportion of the catch be reserved for Indians. Indeed, *Puyallup Tribe* v. *Washington Game Dept.,* 391 U. S. 392 (1968) (*Puyallup I*), consistently with *Winans,* described the right of Indians under the treaties as "the right to fish 'at all usual and accustomed places.'" 391 U. S., at 398.[5] The issue before the Court in *Puyallup I* was the extent to which the State could regulate fishing. It held:

"[T]he 'right' to fish outside the reservation was a treaty

---

[4] The Government's brief in *Winans,* cited approvingly by the Court in that case, indicates that the Government also understood the treaty to guarantee nothing more than access rights to traditional fishing locations. In that brief, the Government advocated only "a way of easy access, free ingress and egress to and from the fishing grounds." Brief for Appellants, O. T. 1904, No. 180, p. 56.

This interpretation of *Winans* was unequivocally affirmed by the Court a short time later in *Seufert Bros. Co.* v. *United States,* 249 U. S. 194 (1919). At issue in that case was whether Indians from the Yakima Nation had the right under their treaty to cross the Columbia River and fish from the south bank, which admittedly had belonged to other tribes at the time of the treaty. The Court viewed *Seufert,* a case unquestionably involving only the right of access, to be squarely controlled by its earlier decision in *Winans.* 249 U. S., at 198. Moreover, the Court reaffirmed its view that the effect of the reservation of common fishing rights to the Indians amounted to a servitude. *Id.,* at 199.

[5] The treaty right was repeatedly referred to in *Puyallup I* as a "right to fish." This phrase was used no less than seven times in the course of the opinion, with no distinction being made between the right "to fish" and the right "of taking fish." 391 U. S., at 397–399.

'right' that could not be qualified or conditioned by the State. But 'the time and manner of fishing . . . necessary for the conservation of fish,' not being defined or established by the treaty, were within the reach of state power." *Id.,* at 399.

The Court today finds support for its views in *Puyallup I* because the Court there recognized that, apart from conservation measures, the State could not impose restrictive regulations on the treaty rights of Indians. But it does not follow from this that an affirmative right to a specified percentage of the catch is guaranteed by the treaties to Indians or to non-Indians, for the Court misapprehends the nature of the basic right sought to be preserved by Congress. This, as noted above, was a right of the Indians to reach their usual and accustomed fishing areas. Put differently, this right, described in *Winans* as a servitude or right over land not owned by the Indians, entitles the Indians to trespass on any land when necessary to reach their traditional fishing areas, and is a right not enjoyed by non-Indian residents of the area.

In permitting the State to place limitations on the Indians' access rights when conservation so requires, the Court went further in *Puyallup I* and suggested that even regulations thus justified would have to satisfy the requirements of "equal protection implicit in the phrase 'in common with.'" 391 U. S., at 403. Accordingly, in *Washington Game Dept.* v. *Puyallup Tribe,* 414 U. S. 44 (1973) (*Puyallup II*), we considered whether the conservation measures taken by the State had been evenhanded in the treatment of the Indians. At issue was a Washington State ban on all net fishing—by both Indians and non-Indians—for steelhead trout in the Puyallup River. According to testimony before the trial court, the annual run of steelhead trout in the Puyallup River was between 16,000 and 18,000, while unlimited sport fishing would result in the taking of between 12,000 and 14,000 steelhead annually. Because the escape of at least 25% of the entire

run was required for hatcheries and spawning, the sport fishing totally pre-empted all commercial fishing by Indians. The State therefore imposed a ban on all net fishing. The Indians claimed that this ban amounted to an improper subordination of their treaty rights to the privilege of recreational fishing enjoyed by non-Indians.

We held in *Puyallup II* that the ban on net fishing, as it applied to Indians covered by treaty, was an infringement of their rights. The State in the name of conservation was discriminating against the Indians "because all Indian net fishing is barred and only hook-and-line fishing entirely pre-empted by non-Indians, is allowed." *Id.*, at 48. Because "[o]nly an expert could fairly estimate what degree of net fishing plus fishing by hook and line would allow the escapement of fish necessary for perpetuation of the species," *ibid.*, we remanded to the Washington courts for a fair apportionment of the steelhead run between Indian net fishing and non-Indian sport fishing.

Relying upon the reference in *Puyallup II* to "apportionment," the Court expansively reads the decision in that case as strongly implying, if not holding, that the catch at Indians' "accustomed" fishing sites must be apportioned between Indian and non-Indian fishermen. This view certainly is not a necessary reading of *Puyallup II*. Indeed, I view it as a quite unjustified extension of that case. *Puyallup II* addressed an extremely narrow situation: where there had been "discrimination" by state regulations under which "all Indian net fishing [was] barred and only hook-and-line fishing entirely pre-empted by non-Indians, [was] allowed." *Ibid.* In any event, to the extent language in *Puyallup II* may be read as supporting some general apportionment of the catch, it is dictum that is plainly incompatible with the language and historical understanding of these treaties.[6]

---

[6] Having decided that some regulation was required, but that the treaty forbade the State to choose to regulate only Indian fishing for conservation

Emerging from our decisions in *Winans, Puyallup I,* and *Puyallup II,* therefore, is the proper approach to interpretation of the Indians' common fishing rights at the present time, when demand outstrips supply. The Indians have the right to go to their traditional fishing grounds to fish. Once there, they cannot be restricted in their methods or in the size of their take, save insofar as restrictions are required for conserving the fisheries from which they draw. Even in situations where such regulations are required, however, the State must be evenhanded in limiting Indian and non-Indian fishing activity. It is not free to make the determination—apparently made by Washington with respect to the ban on net fishing in the Puyallup River—that Indian fishing rights will be totally subordinated to the interests of non-Indians.[7]

## III

In my view, the District Court below—and now this Court—has formulated an apportionment doctrine that cannot be squared with the language or history of the treaties, or indeed with the prior decisions of this Court. The application of this doctrine, and particularly the construction of the term "in common" as requiring a basic 50–50 apportionment, is likely to result in an extraordinary economic windfall to

---

purposes, we remanded for an apportionment between net fishing and sport fishing. *Puyallup Tribe* v. *Washington Game Dept.,* 433 U. S. 165 (1977) (*Puyallup III*), is of little assistance in deciding the issue in the present cases. The Court in that case decided only that the regulations permitted in *Puyallup I* could be applied against Indian fishing on the reservations, as well as off them.

[7] Because it is admitted that the Indians at all times have taken substantial numbers of fish at their traditional fishing places, I do not consider whether a monopolization of all of the fish by the non-Indians would violate the spirit of the Indians' treaty right of access. Of course, if state conservation regulations were to operate discriminatorily to deny fish to Indians, the Court's decision in *Puyallup II* would apply.

Indian fishermen in the commercial fish market by giving them a substantial position in the market wholly protected from competition from non-Indian fishermen.[8]  Indeed, non-Indian fishermen apparently will be required from time to time to stay out of fishing areas completely while Indians catch their court-decreed allotment.  In sum, the District Court's decision will discriminate quite unfairly against non-Indians.[9]

---

[8] The Court apparently sees this windfall as being necessary for the Indians, for it concludes that "in light of the far superior numbers, capital resources, and technology of the non-Indians, the concept of the Indians' 'equal *opportunity*' to take advantage of a scarce resource is likely in practice to mean that the Indians' 'right of taking fish' will net them virtually no catch at all." *Ante,* at 677 n. 22.  But if the situation of the Indians in the Pacific Northwest requires that special provisions be made for their livelihood, this Court should not enact these provisions by reforming a bargain struck more than 100 years ago.  Nor should the cost of compensating for any disadvantage the Indians may suffer, or have suffered, be borne solely by the commercial fishermen of the State of Washington—a fraction of the people who have benefited from the population imbalance.  This is a problem for resolution by Congress.  It has the basic responsibility for making sure that Indians are not discriminated against, and that their rights are fully protected.  In the exercise of this responsibility, Congress could pursue various avenues for relief of any perceived discrimination or disadvantage.  It could, for example, provide for Indian fishermen the modern technology and capital resources that they lack, thereby enabling them to compete on an equal basis with non-Indian fishermen.  Moreover, a legislation of this problem can protect the interests of Indians without imposing substantially the entire cost upon non-Indian fishermen of the State of Washington.

[9] In addition to the burdens placed upon non-Indian fishermen, the Court's decision is likely to prove difficult to enforce fairly and effectively.  To date, the District Court has had to resort to the outer limits of its equitable powers in order to enforce its decree.  This has included taking over supervision of all of the commercial fishing in the Puget Sound area, ordering the creation of a telephone "hot line" that fishermen can use to determine when and where they may legally fish, and ordering United States Marshals to board fishing craft and inspect for violations

To be sure, if it were necessary to construe the treaties to produce these results, it would be our duty so to construe them. But for the reasons stated above, I think the Court's construction virtually ignores the historical setting and purposes of the treaties, considerations that bear compellingly upon a proper reading of their language. Nor do the prior decisions of this Court support or justify what seems to me to be a substantial reformation of the bargain struck with the Indians in 1854–1855.

I would hold that the treaties give to the Indians several significant rights that should be respected. As made clear in *Winans,* the purpose of the treaties was to assure to Indians the right of access over private lands so that they could continue to fish at their usual and accustomed fishing grounds. Indians also have the exclusive right to fish on their reservations, and are guaranteed enough fish to satisfy their ceremonial and subsistence needs. Moreover, as subsequently construed, the treaties exempt Indians from state regulation (including the payment of license fees) except as necessary

of the court's preliminary injunction. Indeed, in his response to the petition for certiorari in the present case, the Solicitor General set forth in some detail the extraordinary difficulty the Government has had in enforcing the District Court's decrees, saying:

"[T]he default of the state government has required the United States to concentrate a disproportionate amount of its limited fisheries enforcement personnel on what is essentially a local enforcement problem. Agents · of the National Marine Fisheries Service, the United States Fish and Wildlife Service, the United States Marshals Service, and the Coast Guard have been diverted from their regular duties to assist the district court in implementing the Indians' treaty rights. This has resulted in a reduction in the federal fisheries services available for the rest of the country and for the enforcement of the ocean fisheries programs governed by the Fishery Conservation and Management Act of 1976." Brief for United States on Petition for Certiorari in Nos. 78–119 and 78–139, p. 20.

These problems, it seems to me, will be exacerbated by a formula apportionment such as that ordered by the Court.

for conservation in the interest of all fishermen. Finally, under *Puyallup II,* it is settled that even a facially neutral conservation regulation is invalid if its effect is to discriminate against Indian fishermen.  These rights, privileges, and exemptions—possessed only by Indians—are quite substantial. I find no basis for according them additional advantages.