**Evan HOOK, et al., Plaintiffs,**

v.

**STATE OF ARIZONA, Defendant.**

**Alan L. GLUTH, Named Class Representative,**

v.

**ARIZONA DEPARTMENT OF CORRECTIONS, et al., Defendants.**

**Fletcher CASEY, et al., Plaintiffs,**

v.

**Samuel A. LEWIS, et al., Defendants.**

**Charles L. ARNOLD, guardian ad litem on behalf of H.B., et al., Plaintiffs,**

v.

**Samuel LEWIS, et al., Defendants.**

Nos. MC 95–86 PHX CAM, CIV 73–0097 PHX CAM, CIV 84–1626 PHX CAM, CIV 90–0054 PHX CAM and CIV 91–1808 PHX CAM.

United States District Court,
D. Arizona.

Oct. 17, 1995.

---

Thomas John Dennis, Bernard Phillip Lopez, Attorney General's Office, Assistant Attorney General, Phoenix, AZ, Richard Albrecht, Robert K. Corbin, Arizona Attorney General's Office, General Law, Civil Division, Phoenix, AZ, Gordon Samuel Bueler, Office of the Attorney General, Phoenix, AZ, for State of Ariz.

Andrew S. Gordon, Coppersmith & Gordon, Phoenix, AZ, for Clifton Blockinger, Jamie Tinoco.

Scott H. Gan, Mesch Clark & Rothschild P.C., Tucson, AZ, for John Barkley.

Joel W. Nomkin, Kristen Brink Rosati, Rachel Rife Weiss; Brown & Bain P.A., Phoenix, AZ, Lawrence B. Weeks, Berkeley, CA, for Alan L. Gluth, Thomas A. Rice, Donald K. Nelson, David M. Bandstra.

Thomas John Dennis, Attorney General's Office, Assistant Attorney General, Phoenix, AZ, Michelle Lynne Mills, Attorney General's Office, Assistant Attorney General, Phoenix, AZ, for William Kangas.

Lynne Abney, Karen L. Lugosi, Attorney General's Office, Assistant Attorney General, Phoenix, AZ, for Frank Terry.

Lynne Abney, Karen L. Lugosi, Phoenix, AZ, for Sam Lewis, B.D. Goldsmith.

Lynne Abney, Karen L. Lugosi, Phoenix, AZ, for Andy Moloy, Marge Thompson.

Lynne Abney, Karen L. Lugosi, Phoenix, AZ, for Ariz. Dept. of Corrections, John Avenenti, Ernie Salazar, C.D. Ravago, C.P.O. Moen.

Alice Loeb Bendheim, Alice L. Bendheim P.C., Phoenix, AZ, Adjoa A. Aiyetoro, Stuart Henry Adams, Jr., David Cyrus Fathi, Washington, DC, for Fletcher Charles Casey, Jr., et al., Stephen James, et al., Frank Bartholic, et al., Armando Munoz, et al., Kyle Baptisto, et al., David Allen Mann, et al., Jeffrey C. Lustig, et al., Terry Don McFalls, et al., Randy Steven Sampson, et al., John Tomlin, et al., Scott Tramposch, et al., Pamela McQuillen, et al., Carolyn Kaye Ferguson, et al., Yvonne Martin, et al., David Tucker, et al., Susan Colker, et al., John Robert Myers, et al., Marya Jo Booker, et al., Randy Lee Thomas, et al., Ruth Johnson, et al., Roman Stone, et al.

Alice Loeb Bendheim, Phoenix, AZ, Adjoa A. Aiyetoro, Stuart Henry Adams, Jr., David Cyrus Fathi, Washington, DC, for Robert Bankston, et al.

Edward G. Hochuli, Kathleen L. Wieneke, Jones Skelton & Hochuli, Phoenix, AZ, for Samuel A. Lewis.

Edward G. Hochuli, Phoenix, AZ, for Robert Goldsmith, William Rhode, George Herman, Roger Crist, Hal Cardin, Warden, Arizona State Prison Complex, Phoenix, defendant.

Erwin B. Cornstuble, pro se.

Leslie J. Cohen, Tucson, AZ, for Charles L. Arnold.

Edward G. Hochuli, Kathleen L. Wieneke, Daniel Patrick Struck, Jones Skelton & Hochuli, Phoenix, AZ, Vicki Gotkin Adler, Attorney General's Office, Criminal Division, Phoenix, AZ, for Samuel Lewis, Mary Vermeer, David Fernandez.

Craig Allen Stephan, Scottsdale, AZ, for Dan Pochoda, Janet Bliss.

James Russel Morrow, Office of the Attorney General, Phoenix, AZ, John M. Gaylord, Arizona Attorney General's Office, Phoenix, AZ, for Ariz. Dept. of Corrections.

Andrew S. Gordon, Samuel George Coppersmith, Coppersmith & Gordon, Phoenix, AZ, for Evan Arthur Hook.

Joel W. Nomkin, Kristen Brink Rosati, Rachel Rife Weiss, Brown & Bain P.A., Phoenix, AZ, for Alan L. Gluth.

## ORDER GRANTING PLAINTIFFS' MOTIONS FOR CONTEMPT AND DENYING DEFENDANTS' MOTIONS TO MODIFY

DAVID ALAN EZRA, District Judge[1].

The court heard Plaintiffs' motions for contempt and Defendants' motions for modification on September 28, 1995. Andrew S. Gordon & Coppersmith and Gordon appeared on the briefs or at the hearing on behalf of the Plaintiffs in *Hook v. Arizona.* Joel W. Nomkin, Kirsten B. Rosati and Rachel Rife Weiss of Brown & Bain appeared on the briefs or at the hearing on behalf of the Plaintiffs in *Gluth v. Kangas.* Assistant Arizona Attorney General James Morrow and Charles J. Cooper, Michael A. Carvin, and Michael W. Kirk of Shaw, Pittman, Potts & Trowbridge appeared on the briefs or at the hearing on behalf of Defendants in all three cases. After reviewing the motions, evidence, and supporting and opposing memoranda, the court GRANTS the Plaintiffs' motions to hold Samuel Lewis in contempt, finds Ariz.Rev.Stat. Ann. § 35–152 unconstitutional, and DENIES Defendants' motions to modify.

## I. FACTS

### A. History of the Consolidated Cases

Three prisoner civil rights cases are consolidated for the purpose of resolving the issue of payment of Special Masters' fees. Although the relevant facts are outlined in greater detail below, the instant motions involve three principal facts: (1) in all three cases, the court ordered Defendants to pay Special Masters' fees; (2) the Arizona Legislature enacted Ariz.Rev.Stat.Ann. § 35–152, which prohibits payment of Special Masters' fees without first obtaining a legislative appropriation for such payment; and (3) Defendants have refused to pay the fees since the enactment of § 35–152.

### 1. *Hook v. State of Arizona Dept. of Corrections*

Twenty-two years ago, this lawsuit arose from a dispute about mail regulations and restrictions in the Arizona Department of Corrections ("ADOC").[2] Evan Hook and ten other inmates filed a lawsuit alleging that ADOC mail policies violated their First and Fourteenth Amendment rights. The inmates claimed, inter alia, that they had constitutional rights to receive certain magazines as well as the right to send and receive specific mail. In 1973, the parties entered into a Stipulated Consent Decree ("the Decree" or "Consent Decree"), which included a comprehensive scheme of mail regulations. On October 19, 1973, the court entered an order approving the stipulation for the Consent Decree. The Decree was amended once on May 10, 1974.[3]

Over the past five years, the court has enjoined ADOC Director Samuel Lewis and the ADOC on several occasions from modifying the terms of the Consent Decree without filing the proper motion for modification pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[4] The record reveals that while the district court and the Ninth Circuit

---

1. This court is sitting by designation of the Chief Judge of the Ninth Circuit and with approval of the Chief Judge of the District of Arizona.

2. *Hook*, CIV 73–97 PHX CAM. A thorough history of all three cases is set forth in the *Hook* Order dated June 3, 1994.

3. Pursuant to a stipulation of the parties, certain paragraphs of section VI and VII of the Decree were changed. The parties sought the changes pursuant to Fed.R.Civ.P. 60(b).

4. Fed.R.Civ.P. 60(b) provides in pertinent part:

 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding [if] ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) [for] any other reason justifying relief from the operation of the judgment. The motion shall be made with-

have advised Defendants that a Rule 60(b) motion is the proper vehicle through which the terms of the Decree may be changed, Defendants have continually failed to comply with the court's orders.

In the original Decree, the ADOC agreed to allow each inmate to receive up to three twenty-five pound packages between December 10th and 31st of each year. However, on October 4, 1990, the ADOC instituted a new policy limiting each inmate to one twenty-five pound package and imposed various other restrictions. ADOC implemented this policy in direct contravention of the Consent Decree and without court approval pursuant to Rule 60(b). The court enjoined Defendants from modifying the terms of the Decree without filing a motion for modification.[5]

Defendants appealed; the Ninth Circuit affirmed the district court and determined that the ADOC improperly attempted to change the provisions of the Consent Decree. The court stated that changes to the Decree should be made through Rule 60(b). *Hook*, 972 F.2d 1012, 1016–17 (9th Cir.1992).

Thereafter, in October 1992, the ADOC filed a motion to modify the *Hook* Consent Decree. The ADOC requested that the court remove the provision allowing the inmates to receive Christmas food packages. However, in November and December of 1992, Director Lewis and ADOC issued memorandums requiring consumption of food packages by a particular date, also in violation of the court's

order. In January 1993, the court enjoined Defendants from implementing the new policy.[6] The court advised Defendants that the Decree and injunctions would remain in effect until a modification was sufficiently supported by facts or law.

On January 31, 1994, after the Governor of the State of Arizona issued a press release banning specific magazines in state prisons, Director Lewis issued a memorandum to all inmates restricting certain types of magazines. Order, June 3, 1994. In February 1994, the court conducted an emergency hearing to consider Plaintiffs' petition for criminal contempt, civil contempt and sanctions. At that hearing, Defendants' attorneys reported that Director Lewis had withdrawn his Memorandum of January 31, 1994. No written withdrawal was offered and no motion to modify the magazine portion of the Consent Decree was made.

At an order to show cause hearing to determine whether Lewis' January 31, 1994 order constituted civil contempt, Lewis testified that he alone decided to issue the Memorandum of January 31, 1994.[7] The court found Director Lewis in civil contempt and assessed attorneys' fees and costs against Lewis. Order, June 3, 1994.

On June 8, 1994, the court appointed a special master and assistant special master to investigate ongoing allegations of noncompliance and to monitor the implementation of the Christmas package provision.[8] The or-

---

in a reasonable time.... A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. Fed.R.Civ.P. 60(b).

5. The court explicitly "enjoined, restricted and prohibited [Defendants] from making any changes in the implementation of Christmas food packages received pursuant to the Consent Decree approved by this court in *Hook v. Arizona* unless this court issues an order otherwise." Order, December 13, 1990.

6. The court stated:

Until there is an evidentiary hearing and the court has issued a ruling on the motion to modify in this case, the injunction issued on December 11, 1990 is in effect and the defendants cannot circumvent the injunction or violate that injunction piece by piece until there is nothing left of the *Hook* consent decree. As this Court has already informed defendants on

numerous occasions since 1990, changes to the Hook decree are possible.... If the Defendants believe that change should be made to the *Hook* decree, they should present evidence as to why changes should be made at the evidentiary hearing that they have requested in this matter. Prior to the hearing and a decision by this Court, defendants cannot unilaterally change the law.

Order, January 12, 1993.

7. He claimed that the Governor did not direct him to issue the memo and that he had not consulted his attorneys with regard to his decision.

8. The court concluded:

[T]here is a history of noncompliance in this lawsuit. Indeed, the Court simply does not have the resources necessary to investigate the volume of alleged violations of the Consent

der also set forth the details for instruction on payment by ADOC of the Special Masters' fees and expenses.[9] Defendants objected to the fees of the Assistant Special Master, but withdrew their objection shortly thereafter.

The court entered an order on August 4, 1994, denying, inter alia, Defendants' motion to stay the appointment of the Special Master; granting Defendants' motion to stay the payment of fees under the June 3, 1994 order pending appellate review; and granting in part Plaintiffs' motion for class certification.

### 2. Gluth v. Kangas

*Gluth v. Kangas,* 773 F.Supp. 1309 (D.Ariz. 1988), *aff'd,* 951 F.2d 1504 (9th Cir.1991), was brought on behalf of prisoners confined to the Central Unit of the Arizona State Prison at Florence. Plaintiffs alleged a denial of their constitutional right of access to the courts.[10] At the summary judgment stage, Defendants failed to come forward with facts

> Decree. Therefore, the Court is appointing a special master to report to the Court with a factual record needed to determine if ADOC is in compliance with the Consent Decree, and, if not, recommend specific means of enforcing the Decree.
>
> Order, June 8, 1994, at 3.

**9.** The compensation provisions state:

> (2) No later than the First day of each month, the special Master and the Assistant special Master shall each submit an itemized statement of their fees for the previous month to defendants' counsel. The special Master and Assistant special Master will be compensated by the defendants for their fees within fourteen (14) days of receipt of the special Master's monthly invoice. Such compensation will continue until the special Master's duties are fulfilled according to the Court's order.
>
> . . . . .
>
> (4) If there is an objection to particular itemized expenses, payment will *not* be deferred pending the Court's determination of the objection. Defendants shall provide full payment to the special Master and if the Court determines that the objection is reasonable, the special Master will reimburse defendants any amount the Court determines to be unreasonable.
> (5) If the defendants object to the payment of any of the expenses or costs, they shall file those objections within thirty (30) days of receipt of the bill. The Court will examine that bill to determine if it is fair and reasonable under the circumstances.

in response to Plaintiffs' motion and the court entered judgment against Defendants.[11]

The court entered an injunction mandating improvement in the operation of and access to the law library in April, 1990.[12] The court also appointed a special master to investigate methods to attain the goal of constitutionally adequate access to the courts. *See* Order, September 27, 1989.[13] The Special Master's responsibilities included monitoring ADOC compliance with the injunction and reporting to the court every six months. In August 1990, the court entered an injunction setting forth standards for determining whether an inmate qualifies for indigent status and ordered that certain supplies be provided to them. Order, August 28, 1990.

However, pending Defendants' appeal to the Ninth Circuit, Plaintiffs filed a petition for order to show cause why the defendants

*Hook* Order, June 8, 1994, at 11. The *Gluth* and *Casey* special master provisions are substantially the same.

**10.** In their summary judgment motion, Plaintiffs alleged deficiencies in library access, legal assistant and law library clerk training, and ADOC policies toward indigent inmates.

**11.** The court ruled that: (1) prisoners denied physical access to the prison law library must receive assistance from someone trained in the law; (2) prisoners were arbitrarily denied physical access to the library (despite existing regulations providing such access) and therefore the new regulations proffered by Defendants failed to insure that inmates would enjoy adequate access; and (3) the prison's indigency policy was unacceptable because it forced inmates to choose between purchasing necessary hygienic and legal supplies. *See* Memorandum Adopting Special Master's Proposed Order, April 25, 1989, at 8.

**12.** The court highlighted Defendants' continuous refusal to cooperate in formulating the terms of injunction in the court's Memorandum dated April 27, 1990.

**13.** The court stated, "The Special Master's work in this case has been invaluable. His expertise and understanding of the situation at the Central Unit have given him the ability to sit down and negotiate a permanent injunction that, not only is consistent with the goals of the Court's April 13, 1989 opinion, but is also agreeable to both sides. In fact, at the hearing, on March 29, 1990, defendants only had two objection to the special Master's proposed injunction." Memorandum Adopting Special Master's Proposed Order, April 25, 1989, at 13.

should not be held in civil contempt. In support of their petition, Plaintiffs listed six pages of violations of the permanent injunction provisions. However, based upon stipulation of the parties, the court vacated the order to show cause hearing.

The Special Master filed his first evaluation report on January 3, 1991; his investigation "revealed significant areas of non-compliance." The Special Master concluded that legal access had not improved or had worsened during the six months after the permanent injunction was entered.

On appeal, the Ninth Circuit affirmed the district court "in all respects." *Gluth v. Kangas,* 951 F.2d 1504, 1512 (9th Cir.1991). However, Defendants continued their non-compliance with the permanent injunction. For example, in 1993, Defendants fired the Florence law librarian who had been hired pursuant to court order. After an investigation, the Special Master found that the librarian was fired for cooperating with the Special Master. Also, in 1993 and 1994, the Special Master's investigations revealed at least two more violations of the permanent injunction.

The Special Master submitted a status report to the court on August 16, 1995. He concluded that Defendants' failure to "provide the required payments will end the ability of the Special Master and Assistant to carry out any aspect of the court ordered responsibilities. Even a delay will necessitate the dismantling of the Special Master's operation." Special Master's Report, August 16, 1995, at 3.

### 3. *Casey v. Lewis*

*Casey v. Lewis,* CIV 90–0054, is a statewide class action civil rights case in which the members of the class include all prisoners in custody of the ADOC. Numerous issues were tried in the case, including Plaintiffs' allegations of inadequate medical, dental, and mental health care, handicapped access, access to the courts and due process. After a bench trial, the court ruled in favor of Plaintiffs on the access to the courts and mental health care issues,[14] and in favor of Defendants on the medical care, dental care, handicap access and due process issues. *Casey v. Lewis,* 834 F.Supp. 1553 (D.Ariz.1992), *aff'd,* 43 F.3d 1261 (9th Cir.1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 1997, 131 L.Ed.2d 999 (1995); *Casey v. Lewis,* 834 F.Supp. 1477 (D.Ariz.1993); *Casey v. Lewis,* 834 F.Supp. 1569 (D.Ariz.1993); *Casey v. Lewis,* 837 F.Supp. 1009 (D.Ariz.1993).

The district court issued an order in October 1992, finding that ADOC policies violated inmates' constitutional rights of access to the courts. The court adopted a modified version of the injunction from *Gluth* and appointed the Special Master from *Gluth* to propose a final injunction to cure the constitutional violations. *Casey v. Lewis,* 834 F.Supp. 1553 (D.Ariz.1992).

The record reveals that Defendants have continually refused to comply with the permanent injunction entered on October 8, 1993. Such noncompliance includes a general failure to address ongoing violations and refusals to accommodate the special master's office in its investigatory duties. The court has threatened Defendants with contempt on numerous occasions. Although the district court and the Ninth Circuit denied requests by Defendants for a stay of the injunction, the Supreme Court granted a stay. *Lewis v. Casey,* —— U.S. ——, 114 S.Ct. 1638, 128 L.Ed.2d 360 (1994). The Ninth Circuit subsequently affirmed the district court's ruling on the access to the courts issue and the Supreme Court has granted certiorari to review the decision. As a result of the stay, there has been little Special Master activity in *Casey* and there are nominal outstanding Special Master bills.

■ Defendants erroneously assert that the Supreme Court's stay in *Casey* terminated the Special Master's authority in *Gluth.* Therefore, Defendants contend that the Special Master in *Gluth* improperly continued to incur fees after the Supreme Court stayed

---

14. The district court found that the mental health care system violated the Eighth Amendment. 834 F.Supp. 1477 (D.Ariz:1993). Relevant to the mental health care issue, Defendants assert that

Dr. Rundle, Special Master in the mental health portion of *Casey,* was removed from the case because of overbilling. This contention is not supported by the record.

the *Casey* access to the courts injunction. Defendants' claim is without merit.

The *Gluth* injunction, including appointment of the Special Master, was affirmed by the Ninth Circuit; *Gluth* is a final, separate decision. The court simply consolidated monitoring of *Casey* and *Gluth* relevant to the *Casey* access to the courts issue in order to save the Defendants money. *Gluth* was not superseded by *Casey* and the Special Master was not acting without authority. In fact, the court clarified this issue in its Order, March 18, 1994, stating:

> the *Gluth* permanent injunction is still applicable to the Central Unit in Florence for those issues litigated in *Gluth*. In addition, the access to the courts permanent injunction in *Casey*, entered October 8, 1993, applies to Central Unit in Florence for those issues not litigated in *Gluth*, including attorney-client phone calls.

Order, March 18, 1994. Moreover, Defendants continued to pay the Special Masters even after the stay was granted in *Casey*.

**B. Ariz.Rev.Stat.Ann. § 35–152**

On April 19, 1995, Governor Symington signed into law a state statute prohibiting payment of fees and expenses incurred by special masters appointed by federal courts. Ariz.Rev.Stat.Ann. § 35–152. The statute became effective July 13, 1995, and provides:

> A. An officer, employee or agent of this state shall not open and maintain an account for the purpose of paying fees and expenses that are incurred by a special master who is appointed by a federal court.

> B. Notwithstanding any law to the contrary, an officer, employee or agent of this state is not subject to personal liability for complying with subsection A.

> C. An officer, employee or agent of this state shall not pay fees and expenses for special masters appointed by a federal court unless the legislature appropriates monies for the payment of the special master fees and expense.

> D. Notwithstanding any law to the contrary, the failure of the legislature to appropriate monies for the payment of fees and expenses for special masters appointed by a federal court does not subject an officer, employee or agent of this state to personal liability for the special master fees and expenses.

> E. This section applies to all bills for fees and expenses for special masters appointed by a federal court that are submitted after the effective date of this section.

Ariz.Rev.Stat.Ann. § 35–152.

Samuel Lewis, the Director of the ADOC and a defendant in all three cases, was a key supporter of the legislation. He testified before the Senate Committee on Government Reform on March 21, 1995, and urged the state legislature to enact the measure for the specific purpose of asserting "state's rights" and challenging the federal district court's actions in prisoner cases.[15]

State legislators also acknowledged that the intent of the provision was to set up a confrontation with the federal courts over states' rights.[16] *See* Testimony of Represen-

---

15. Lewis stated, "I believe that this is a case of state's rights. I think it is this time for us to find out exactly where the power of the federal government begins and ends so that the Department simply becomes the instrument by which we attack this in the courts." *See* Transcript of Hearing Before the Arizona State Senate Committee on Government Reform, March 21, 1995, at 7; Minutes of March 21, 1995 Hearing before Arizona State Senate Committee on Government Reform, at 4.

16. Representative Earnest Baird, a co-sponsor of House Bill 2523 (§ 35–152), explained, "basically what we are trying to do here is set up a confrontation on who has the appropriations power in this State. Is it the State Legislature who represents the people of this State or is it a federal Judge who has been appointed for life and ends up abusing his position as a federal Judge...." Transcript of Hearing Before the Arizona State Senate Committee on Government Reform, March 21, 1995, at 3.

Defendants allege that they have had "longstanding" objections to the unnecessary fees and costs. In their opposition to Plaintiffs' order to show cause, Defendants discuss the special master fees at length, asserting that billing by the Special Masters has been careless, unsupported and excessive. However, any alleged unreasonableness or inaccuracies in billing by the special masters should be brought to the attention of the court pursuant to the procedures set forth in the orders appointing the special masters. *See, e.g., Hook* Order, June 8, 1994, at 11. Accordingly,

tative Baird, Transcript of Hearing Before the Arizona State Senate Committee on Government Reform, March 21, 1995, at 3.

On August 2, 1995, the Special Master in *Gluth* and *Hook* submitted his invoices for services performed by his office during July 1995, and the Assistant Special Master submitted her invoices for *Gluth, Hook,* and *Casey.* Pursuant to the appointment orders, ADOC was required to pay these bills by August 16, 1995. Defendants were also required to reimburse expenses within that time period. Those bills have not been paid. Additionally, the bills submitted by the Special Master and Assistant Special Master in September 1995 for the month of August 1995 have not been paid by Defendants.

## II. DISCUSSION

### A. Federal Courts and Prison Regulation

■ It is well settled that federal courts can invoke judicial authority if local and state authorities, who have primary responsibility for curing constitutional violations, fail in their affirmative obligations. *See Hutto v. Finney,* 437 U.S. 678, 687 n. 9, 98 S.Ct. 2565, 2571 n. 9, 57 L.Ed.2d 522 (1979). To that end, "[f]ederal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Stone v. City of San Francisco,* 968 F.2d 850, 861 (9th Cir.1992) (citing *Hutto,* 437 U.S. at 687 n. 9, 98 S.Ct. at 2571 n. 9), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993). While federal concerns may enter into "institutional litigation involving correctional facilities, they do not automatically trump the powers of the federal courts to enforce the Constitution or a consent decree." 968 F.2d at 861.

### B. The Supremacy Clause

Plaintiffs argue that this court has the authority to order payment of the Special Masters' fees despite the recent enactment of Ariz.Rev.Stat.Ann. § 35–152, under the Supremacy Clause of the United States Constitution.[17] Defendants response is twofold: first, Defendants claim that the statute should not be found unconstitutional because alternative measures are available to the Special Masters; second, Defendants argue that the Eleventh Amendment prevents this court from finding the state statute unconstitutional.

■ A state statute that has the effect of thwarting a federal court order enforcing federal rights "cannot survive the command of the Supremacy Clause of the United States Constitution." *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979) (citations omitted); *see also Spain v. Mountanos,* 690 F.2d 742, 746 (9th Cir.1982). In *Washington v. Washington State,* the Ninth Circuit affirmed a district court order directing the Washington State Department of Fisheries to adopt regulations to protect Indian fishing rights. In a parallel state court proceeding, the Washington court concluded that the order was void because the federal court lacked the authority to order state officials "to do any act they were not authorized by laws of the state from which they derive[d] their power." *See Puget Sound Gillnetters Ass'n v. Moos,* 88 Wash.2d 677, 565 P.2d 1151, 1155 (1977) (cited in *Spain v. Mountanos,* 690 F.2d at 746). The United States Supreme Court granted certiorari in both proceedings, affirmed the Ninth Circuit, and vacated the Washington Supreme Court decision. The Supreme Court specifically rejected the state court ruling regarding state officials' capacity to act under the state law and held that a state-law prohibition against compliance with a district court order could not survive the Supremacy Clause. 443 U.S. at 695, 99 S.Ct. at 3079.

the court declines to address Defendants' contentions here.

**17.** Article VI, clause 2 of the United States Constitution provides:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const. art. VI, cl. 2.

In *Spain v. Mountanos,* the Ninth Circuit followed the Supreme Court's decision in *Washington v. Washington State.* 690 F.2d at 746. *Spain* involved unconstitutional conditions of confinement at a California state prison. The district court entered an injunction against specific prison practices; the Ninth Circuit affirmed in part and reversed in part. *Id.* at 743–44. Upon remand, the parties entered into a settlement agreement pursuant to which the defendants were to pay plaintiff attorneys' fees. *Id.* at 744. However, the California state legislature refused to appropriate the funds for payment of attorneys' fees. *Id.*

■ The *Spain* court affirmed the district court order compelling state officials to pay the claim for 42 U.S.C. § 1988 attorneys' fees, pursuant to Fed.R.Civ.P. 70. 690 F.2d at 746. One of the state attorney general's arguments was that the court order was improper because the state statute prohibited payment without legislative appropriations. 690 F.2d at 745. The Ninth Circuit relied on *Washington v. Washington State,* and held that, "[u]nder the Supremacy Clause of the United States Constitution, a court, in enforcing federal law, may order state officials to take actions despite contravening state laws." *Id.* at 746. The court concluded that, "a state cannot frustrate the intent of section 1988 by setting up state law barriers to block enforcement of an attorney's fees award." *Id.* Accordingly, this court has the authority to order compliance with the federal district court orders even though the action may violate Ariz.Rev.Stat.Ann. § 35–152.

Defendants admit that there is a conflict between the federal court orders and the newly enacted state statute prohibiting payment in the absence of legislative action. However, Defendants present a lengthy argument in their opposition to Plaintiffs' contempt motions that the conflict between the federal orders and the state statute would not exist if the court would only change its orders.

The district court appointed the Special Masters pursuant to Fed.R.Civ.P. 53,[18] to monitor and enforce Defendants' compliance with court-ordered remedial measures addressing constitutional violations of prison inmates. The Special Masters were appointed after court monitoring alone had been demonstrated to be inadequate.

Section 35–152 provides that an officer, employee or agent of the state will not pay special master fees for masters appointed by a federal court unless the legislature appropriates the money. Ariz.Rev.Stat.Ann. § 35–152(C). Defendants have relied on this provision to justify nonpayment of special master fees. Although the Arizona statute conflicts with the federal court orders regarding payment of the Special Masters and with Rule 53, defendants assert that the court has an obligation to "harmonize" its order with the statute. Transcript of Hearing, September 28, 1995, at 33.

At the contempt hearing on September 28, 1995, Defendants stated that the notion of comity was at the heart of their argument. *Id.* at 30. They asserted, "when a federal court determines that a federal substantive right can be enforced or vindicated through a remedial approach that respects state law, the federal court must respect state law and adopt that remedial measure.... [I]f there's an alternative available that respects state law, it cannot adopt a remedial measure that does not respect [or conflicts] with state law." *Id.* Defendants' argument is flawed in two key respects.

First, under Defendants' theory, a state would have unbridled authority to enact statutes in order to insulate it from federal court orders and from federal laws. By enacting Ariz.Rev.Stat.Ann. § 35–152, the Arizona Legislature has attempted to limit the jurisdiction of the federal court. Specifically, Section 35–152 excepts Defendants from their responsibility under the court's order to pay the masters; that order was issued pursuant to Fed.R.Civ.P. 53(a). In effect, then, Defendants modify Rule 53(a) as it applies in

---

**18.** Rule 53 requires the court to fix the compensation for special masters and provides that compensation "shall be charged upon such of the parties or paid out of any fund or subject matter of the action, which is in the custody and control of the court as the court may direct...." Fed. R.Civ.P. 53.

Arizona. By extension, Defendants' argument would apply equally to orders of the Ninth Circuit or of the Supreme Court.[19] Defendants' argument has no logical stopping point.[20]

Second, Defendants assume that Judge Muecke, in appointing special masters in these cases, did not consider other alternatives available to the court, such as the monitoring of compliance by a magistrate. The court cannot agree with Defendants; the record shows that Judge Muecke was aware of the court's alternatives and made a determination that a special master was best suited to perform the demanding monitoring and reporting functions. Furthermore, Defendants have pointed to nothing that has occurred subsequent to the appointment of the masters, including the enactment of Ariz. Rev.Stat.Ann. § 53–152, to demonstrate that factors upon which Judge Muecke based his initial decision have become irrelevant or inapplicable.

Also at the hearing, Defendants stated several times, "our position is premised on the proposition that an alternative remedial technique is available. If that is wrong, then, yes . . . we lose." Defendants suggest three alternatives to monitoring by a special master: (1) Plaintiffs are capable of self-monitoring and can bring any noncompliance to the court's attention; (2) the court should appoint a magistrate judge to monitor the case; and (3) the court should use the procedure set forth in Ariz.Rev.Stat.Ann. § 35–152 to obtain appropriation from the legislature. *See* Defendants' Opposition to Order to Show Cause, at 34–35. None of these options present a realistic alternative remedial technique that can supplant the role of the Special Master.

**19.** The court identified this flaw in Defendants' argument at the contempt hearing:

the answer lies in the issue of whether a state has the authority in a circumstance like this to essentially rewrite the Federal Rules of Civil Procedure by enacting laws confining, if you will, federal court jurisdiction. Because in this circumstance, we have the State in effect attempting to rewrite the Federal Rules of Civil Procedure and remove in the State of Arizona an option otherwise available under those rules . . . If we follow Arizona law, Arizona will be the only state, to my knowledge, in which that option would be available . . . So Arizona would be the only state in which the Federal Rules of Civil Procedure on the appointment of Special Masters in state cases would be unavailable. So in effect, we would be allowing the Arizona state legislature to assume a power of Congress, a power exclusively within the authority of the United States Congress, and that is to enact those rules in conformance with the Supreme Court of the United States. Hearing Transcript, September 28, 1995, at 37–38.

**20.** The following excerpt from the transcript of the contempt hearing further highlights the problem with Defendants' argument:

THE COURT: Well, what if Arizona had passed a statute, [that] said, "Well, you know, we're really tired of this whole business of prisoner litigation, and we're not going to cooperate with the federal court in any regard, so what we are going to do now is we're going to pass a statute that says all Arizona state officials are hereby prohibited from cooperating with any federal court order regarding prisons," just period, period, is that okay? . . . .

MR. COOPER: No, Your Honor, I don't think that would be okay.

THE COURT: Well . . . doesn't this have the same, once only slightly removed, doesn't this have the same effect? What it says is: "We will not pay any Special Masters' fees ordered imposed by the federal court." How is that any different from saying: "We are not going to cooperate. We will not in any way enforce or implement any federal court order regarding prison conditions?"

. . . .

MR. COOPER: The difference is that it would not be possible. It would not be possible to effectuate the Court's remedy for constitutional violations in the face of that statute.

THE COURT: The judge could certainly harmonize his decision or her decision with the Arizona state statute by just not issuing any orders that would in any way modify conditions at Arizona state prisons or penitentiaries.

MR. COOPER: And the constitutional rights of the prisoners would go unvindicated.

THE COURT: That's right.

MR. COOPER: And that's not the argument we're advancing. That is not the case.

*Id.* at 43–45. However, that *is* the case. Defendants fail to recognize that if they prevailed in their argument, the constitutional rights of the Plaintiff classes might indeed "go unvindicated." It is clear from the record that Judge Muecke was of this very opinion when he decided to appoint the special masters. Their oversight and expertise was, and is, as demonstrated by the record, necessary to compel compliance by the recalcitrant Defendants to remedy ongoing constitutional violations at various state prisons.

1338

First, this court finds that options one and two were necessarily considered by Judge Muecke when he determined that the appointment of special masters was vital for monitoring Defendants' compliance with court orders. *See* Transcript of Contempt Hearing, September 28, 1995, at 34–37. Second, following option three would necessitate granting Defendants' instant Motion for Modification. As discussed below in Part II, the court denies Defendants' motion. Accordingly, as Defendants note, since no effective alternatives are available, they cannot prevail.

█ Defendants also argue that Ariz.Rev. Stat.Ann. § 35–152 should not be found unconstitutional because the court orders which appoint special masters do not vindicate substantive federal rights or provide the necessary remedial means for the vindication of federal rights. This argument is without merit. All three cases in this action involve civil rights claims pursuant to 42 U.S.C. § 1983 and violations of First, Eighth and Fourteenth Amendment rights. The injunctions issued all seek to provide relief from constitutional violations and the Special Masters were appointed to prevent the recurrence of such constitutional violations.

Therefore, insofar as Ariz.Rev.Stat.Ann. § 35–152 purports to effect the lawful orders of the United States District Court requiring payment of the Special Masters' fees, it is unconstitutional and void.

## C. Eleventh Amendment

Defendants further assert that the Eleventh Amendment [21] prevents this court from finding Ariz.Rev.Stat.Ann. § 35–152 unconstitutional. Plaintiffs argue that the Eleventh Amendment provides no defense for Defendants and that Defendants' arguments are not properly raised in a contempt proceeding because they attack the merits of the injunctions and consent decree.

█ In general, a party in contempt cannot collaterally attack the underlying order in a contempt proceeding. *See Halderman v. Pennhurst State Sch. & Hosp.*, 673 F.2d 628, 637 (3d Cir.1982), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).[22] Rather, an order by a court with subject matter and personal jurisdiction must be obeyed by the parties until reversed by orderly and proper proceedings, "without regard for even the constitutionality of the Act under which the order was issued." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884 (1947). Relevant to collateral attack of an underlying order in a contempt proceeding, the Supreme Court has stated:

It would be a disservice to law if we were to depart from the longstanding rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience.

*United States v. Rylander*, 460 U.S. 752, 756, 103 S.Ct. 1548, 1551, 75 L.Ed.2d 521 (1983).

█ The merits of the injunction and the appointment of the Special Master in *Gluth* were fully litigated before the district court and then affirmed by the Ninth Circuit. *See Gluth*, 951 F.2d at 1507. In *Hook*, the parties entered a consent decree formulated with the participation of Defendants and Defendants never filed a direct appeal. The mental health care injunction in *Casey* is on appeal to the Ninth Circuit and has not been stayed by either the district court or Ninth Circuit, and the Supreme Court has granted certiorari to review the *Casey* access to the courts issue. Accordingly, Defendants have had ample opportunity to raise any Eleventh Amendment issues before and are thus precluded from doing so now. The recent enact-

---

**21.** The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

**22.** In *Halderman*, the Third Circuit found that strong policy reasons militated against permitting contemnors to lodge direct attacks of underlying orders. *See* 673 F.2d at 636.

ment of Ariz.Rev.Stat.Ann. § 35–152 has no bearing on Defendants' Eleventh Amendment arguments.

■ Defendants argue that their Eleventh Amendment claim is allowed in this proceeding because it challenges subject matter jurisdiction. The Supreme Court has held that the Eleventh Amendment "partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974). However, the Supreme Court later clarified that, "because of the importance of state law in analyzing Eleventh Amendment questions and because the state may, under certain circumstances, waive this defense, we have never held that it is jurisdictional in the sense that it must be raised and decided by this court on its own motion." *Patsy v. Bd. of Regents,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982). The Supreme Court has also recognized that an Eleventh Amendment immunity defense may be expressly waived. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). The Ninth Circuit recently clarified that, "Eleventh Amendment immunity, unlike a true jurisdictional bar, may be expressly waived . . . and may even be forfeited by the state's failure to assert it." *ITSI T.V. Prod. v. Agricultural Ass'n,* 3 F.3d 1289, 1291 (9th Cir.1993). In *ITSI,* the Ninth Circuit held Eleventh Amendment immunity is treated as an affirmative defense that is waived if not asserted on direct appeal. *Id.*

Here, the appeal in *Gluth* is final; the *Hook* appeal pertaining to the Special Master has been dismissed and that order is final; and the *Casey* injunctions are on appeal. Under the Ninth Circuit's ruling in *ITSI,* the

Defendants' Eleventh Amendment immunity claim has been waived for *Gluth* and *Hook* and cannot be raised in this proceeding. Defendants in *Casey* may still raise their claim on direct appeal but they cannot raise the claim in this proceeding. Defendants must therefore adhere to the district court order until stayed, set aside or modified by· the court. *United Mine Workers,* 330 U.S. at 293–94, 67 S.Ct. at 695–96.

■ Moreover, the law is clear that the Eleventh Amendment does not preclude the district court from ordering a state to pay fees and costs in civil rights cases. *Hutto v. Finney,* 437 U.S. 678, 696, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978); *Gates v. Collier,* 616 F.2d 1268 (5th Cir.1980). The Special Masters' fees and expenses are costs in the case. *See* Fed.R.Civ.P. 53, 54(d)(1); *National Org. for Reform of Marijuana Laws v. Mullen,* 828 F.2d 536, 545 (9th Cir.1987).[23] The district court can properly order payment of the Special Master fees and costs under Fed.R.Civ.P. 53 without violating the Eleventh Amendment. The court finds that the Eleventh Amendment does not preclude a imposition of special masters' fees upon Defendants.

## D. Contempt Power

■ A federal court has the inherent power to enforce court orders through civil contempt. *See Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990); 18 U.S.C. § 401(3).[24] A district court has wide latitude in determining whether there has been a contemptuous defiance of a court order. *Stone v. City of San Francisco,* 968 F.2d 850, 856 (9th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993) (citations and

---

**23.** In *Mullen,* the Ninth Circuit held that the fees and expenses of the special master appointed under Rule 53 were costs of the lawsuit and could be assessed against the United States. 828 F.2d at 545–46. Also, Defendants' argument that *Hutto* can be distinguished because 42 U.S.C. § 1988 specifically mentions attorneys' fees as costs is without merit.

**24.** 18 U.S.C. § 401(3) provides:
A court of the United States shall have power to punish by fine or imprisonment, at its dis-

cretion, such contempt of its authority, and none other, as—
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
 (2) Misbehavior of any of its officers in their official transactions;
 (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
18 U.S.C. § 401(3).

internal quotations omitted). The Ninth Circuit's rule regarding contempt "has long been whether defendants have performed 'all reasonable steps within their power to insure compliance' with the court's orders." *Stone*, 968 F.2d at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977)). The moving party bears the burden of establishing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. *See Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir.1989). The burden then shifts to the contemnors to demonstrate why they were unable to comply. *See Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). The contemnors must show that they took every reasonable step to comply. *See Sekaquaptewa*, 544 F.2d at 406. In assessing whether an alleged contemnor took "every reasonable step" to comply with the terms of a consent decree, a district court can consider (1) a history of noncompliance and (2) a failure to comply despite the pendency of the contempt motion. *Stone*, 968 F.2d at 857. A party's subjective intent is irrelevant.[25]

■■■■ Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both. *United Mine Workers*, 330 U.S. at 303–04, 67 S.Ct. at 700–01. *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir.1985). If the contempt sanction is compensatory, those sanctions must be limited to actual losses sustained as a result of the contemptuous behavior. *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir.1986) (citations omitted).

■■■ Plaintiffs seek to have this Court impose civil contempt sanctions against Samuel Lewis.[26] Plaintiffs point out that the imposition of sanctions is expressly authorized by Fed.R.Civ.P. 70 [27] and Fed.R.Civ.P. 53(a).[28]

Plaintiffs have demonstrated by clear and convincing evidence violations of the court's specific and definite court orders; there is no dispute that Defendants have failed to pay the Special Master's fees and expenses. Accordingly, Defendants must show they have taken all reasonable steps to comply with the court orders.

Defendants argue that Ariz.Rev.Stat.Ann. § 35–152 precludes their compliance. In their motion for modification, Defendants as-

25. "A party cannot disobey a court order and later argue that there were 'exceptional circumstances' for doing so. This proposed 'good faith' exception to the requirement of obedience to a court order has no basis in law." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir.1987).

26. Specifically, Plaintiffs petition the court to impose sanctions against Lewis for payment of the outstanding fees and expenses, a fine of $1,000.00 per day *until compliance*, and the amount of attorneys' fees and costs incurred to bring this petition. The court will determine appropriate sanctions after the November 1, 1995 hearing.

27. Fed.R.Civ.R. 70 provides in relevant part:

If a judgment directs a party to ... perform any [ ] specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party. On application by the party entitled to performance, the clerk shall

issue a writ of attachment or sequestration against the property of the disobedient party to compel obedience to the judgment. The court may also in proper cases adjudge the party in contempt.
Fed.R.Civ.P. 70.

28. Rule 53(a) states, "when the party ordered to pay the compensation allowed by the court does not pay it after notice and within the time prescribed by the court, the master is entitled to a writ of execution against the delinquent party."
Fed.R.Civ.P. 53(a).

Federal Rule of Civil Procedure 69 sets forth the procedure for a writ of execution and provides, in relevant part:
Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

sert that they are in a "catch 22" situation, caught between the court's orders and Ariz. Rev.Stat.Ann. § 35–152. Defendants submit that Arizona's Department of Administration, Risk Management office, is not able to process the recent statements for special master fees and expenses due to the enactment of Ariz.Rev.Stat.Ann. § 35–152 and the lack of the appropriation of monies from the Legislature. Importantly, however, Defendants are not arguing that the state lacks the funds to pay the fees and expenses. Instead, Defendants assert a "legal impossibility" defense, alleging that they cannot comply with federal court orders without violating Ariz. Rev.Stat.Ann. § 35–152.

A similar argument was rejected by the Third Circuit in *Halderman v. Pennhurst State Sch. & Hosp.*, 673 F.2d 628 (3d Cir. 1982), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984), a case which is particularly persuasive here.[29] Presented with similar facts, the Third Circuit affirmed the district court's contempt order; the court first concluded that the defendants should have made a Rule 60(b) motion instead of resorting to "self-help," i.e., ceasing payments to the Special Masters. *Id.* at 637–38. Second, the court rejected the defendants' "legal impossibility" argument and held, "in the circumstances here, where the contemnor participated in effectuating the change in the law which is alleged to establish a legal impossibility, sound policy does not permit the by-passing of the orderly route to appellate review provided by Rule 60(b)." *Id.* at 639;[30] *see also United States v. Asay*, 614 F.2d 655, 660 (9th Cir.1980) (while "[i]nability to comply with an order is ordinarily a complete defense to a charge of contempt[,] [a]n exception exists when the person charged is responsible for the inability to comply"); *cf. La Raza Unida v. Volpe*, 545 F.Supp. 36, 39 (N.D.Cal.1982) ("[S]tates should not be allowed to shield themselves from federal court judgments by enacting laws requiring legislative appropriations before payment of judicial awards. Otherwise, states would in effect be immune from paying attorneys' fees awards, even though *Hutto* held that the [E]leventh [A]mendment does not apply to the payment of such awards.").

*Halderman* is squarely on point. The record reveals that Director Lewis and the Arizona State Legislature were well aware that disregard of federal court orders could result in civil contempt. Nevertheless, Defendants unilaterally decided to defy the court's orders regarding payment of the Special Masters subsequent to the enactment of Ariz.Rev. Stat.Ann. § 35–152. Defendants' conduct seems particularly egregious since they were instructed by the Ninth Circuit over five years ago that they must comply with the

---

Fed.R.Civ.P. 69(a).

**29.** That case involved a district court order appointing a special master to supervise the planning and implementation of remedial measures to address, inter alia, constitutional violations of mentally retarded plaintiffs in a state institution. *Id.* at 629–30. Pursuant to the district court's order, the Commonwealth of Pennsylvania bore the costs of the special master's office. *Id.* at 630–31. The Secretary of the Department of Public Welfare, in testimony before the state legislature, voiced strong objections to the use of the special master and urged the legislature to reduce the amount of the appropriation for payment of the special master from approximately $900,000 to a lesser amount. *Id.* at 632–34. The legislature passed an appropriation bill in the amount of $35,000, stating, "It is the intent of the [legislature] that this appropriation be used for shutdown costs and that no other funds of the Commonwealth be spent for these functions." *Id.* at 633. Thereafter, "as soon as the appropriations bill became law the Department of Public Welfare ... took the position that they would not obey the [court] orders," and made no

Rule 60(b) motion for relief from the court orders. *Id.* at 634. The district court found that the Secretary had "instigated the action of the legislature for the purpose of dismantling the Masters' offices" and held the defendants in contempt. *Id.*

**30.** The *Halderman* court stated:

> [I]t cannot be said that this is a case in which no other route to appellate review except self-help was available to the contemnors. Moreover by resorting to self-help in a situation where a post-judgment change in the law is arguably a reason for relief from the judgment, a party subject to that judgment deprives the other side of the notice and opportunity to be heard which Rule 60(b) would otherwise require, and of the protection in that rule that "(a) motion under this subdivision (b) does not affect the finality of the judgment or suspend its operation." ... The self-help route leaves the trial court with no alternative except restoration of the status quo ante bellum by a coercive contempt order.

orders until a court makes a modification pursuant to a Rule 60(b) petition.[31] *See, e.g., Hook v. Arizona Dept. of Corrections,* 972 F.2d 1012 (9th Cir.1989).

Director Lewis argues that he has made several attempts to request payment for the July special master's fees and expenses. On August 2, 1995, Defendants requested the Department of Administration, Risk Management Division, to deposit a warrant in the amount of $5,976.18 in the special master's account. On August 3, 1995, Defendants sent the fee statements to the DOA requesting payment directly to the special master. On August 10, 1995, Director Lewis requested emergency placement on the next agenda of the Joint Legislative Budget Committee to obtain appropriations. On August 23, 1995, Director Lewis sent a letter to Governor Symington regarding a special session of the legislature to appropriate the funds. Defendants contend that they "are making every effort to present the issue to the Arizona Legislature...." Defendants' Opposition, at 49. These efforts, however, only evidence Defendants' attempt to comply with Ariz. Rev.Stat.Ann. § 35–152, *not* with the court's orders to pay the special masters.

The court finds that Defendants have neither substantially complied nor taken all reasonable steps within their power to assure compliance with the court's orders. Accordingly, the court GRANTS Plaintiffs' motion to hold Samuel Lewis in contempt.

**E. Defendants' Motions for Modification**

 On the day payment became due on the Special Masters' fees and expenses, Defendants filed a motion for modification.[32] Defendants seek a modification of prior court orders extending the time for payment of the Special Masters' fees and expenses in order to avoid possible sanctions and personal lia-

bility, and to present the Special Masters' statements to the state legislature. Defendants fail to cite any law in their motions to support modification. Rather, they assert a "catch 22" argument and state that modification is necessary in order for them to present the billing statements to the Arizona legislature. In their reply brief, Defendants state that "[t]he gravamen of defendants' motion is that the enactment of A.R.S. § 35–152 effected a change in law requiring modification of the outstanding orders with respect to payment of the masters in these cases." Defendants' Reply Brief, at 2. Defendants also reassert their constitutional arguments in their reply brief. *Id.* at 2–4.

In their reply brief, Defendants cite *Rufo v. Inmates of Suffolk Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), for the proposition that, "a change in law will justify modification of a decree in an institutional reform case." Defendants' Reply Brief, at 2. However, in *Rufo,* the Supreme Court stated:

> [a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties had become impermissible under *federal* law. But modification of a consent decree may be warranted when the statutory or decisional law has *changed to make legal what the decree was designed to prevent.*

502 U.S. at 375, 112 S.Ct. at 755 (emphasis added). Additionally, the Court stated that even if a moving party can meet its burden of establishing a change in the law warranting modification of a consent decree, "the District Court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 391, 112 S.Ct. at 763. One consideration is that, "a modification must not create or perpetuate a constitutional violation."[33] *Id. Rufo* does

*Id.* at 637.

**31.** Indeed, the court may also consider Defendants' history of noncompliance in all three cases, discussed above, in determining whether civil contempt is an appropriate remedy. *See, e.g., Stone,* 968 F.2d at 857.

**32.** At the contempt hearing, Defendants failed to offer a valid reason why the modification motion was not filed before Defendants ceased payments to the special masters. Counsel for Defendants

simply stated, "I wish I had a good answer, but I don't. State officials and legislatures, executive branch officials, their lawyers, were scrambling to do something about this problem—." Defendants' counsel also admitted that failure to pay the special masters was a deliberate act. Transcript of Hearing, September 28, 1995, at 26–27.

**33.** The Supreme Court outlined two other factors concerning consent decree modifications: the proposed modification should not rewrite a con-

not support Defendants' petition for modification for two key reasons: first, the Court was referring to a significant change in federal law that would "legalize" the conduct at which the injunction was aimed; second, in light of the history of continuous noncompliance by the Defendants, the court believes that a modification of the court order would indeed perpetuate the identified constitutional violations.[34]

 Furthermore, as discussed above, Defendants' "legal impossibility" argument lacks merit and does not justify a modification of the court orders regarding payment of the Special Masters. Defendants seem to be arguing that compliance with district court orders may place them in contempt of state courts. Regardless of whether an Arizona state court would hold defendants in contempt for violating Ariz.Rev.Stat.Ann. § 35–152, "Supremacy Clause considerations require that the judgment of the federal court be respected." *Badgley v. Santacroce*, 800 F.2d 33, 38 (2d Cir.1986) (citing *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979)), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

Essentially, the Defendants suggest that the legislature of the State of Arizona be given the power to require a federal court to modify or "harmonize" its orders to comply with the Arizona state law. In other words, that the Arizona legislature be recognized as possessing the authority to enact statutes which have the effect of modifying or overturning a federal court's lawful orders enforcing the U.S. Constitution. The power to overturn or require modification of a federal district court order in constitutional cases lies under the Constitution with the Court of Appeals and the United States Supreme Court. Even the Congress of the United States lacks the power which the Arizona state legislature would enrobe itself.

In light of all facts presented—including Defendants' long history of noncompliance with court orders, Defendants' pivotal role in the enactment of Ariz.Rev.Stat.Ann. § 35–152, and Defendants' unsupported statement that, "the Governor and his senior staff are presently discussing with the leadership of the Arizona Legislature a special session to deal with the issues raised by the enactment" of Section 35–152[35]—the court concludes that a modification is not warranted. The court therefore DENIES Defendants' Motion for Modification.

## III. CONCLUSION

For the reasons stated above the court GRANTS Plaintiffs' Motion to hold Samuel Lewis in Contempt, finds Ariz.Rev.Stat.Ann. § 35–152 unconstitutional, and DENIES Defendants' Motion for Modification. The court will determine the proper sanctions after further hearing on the matter.

IT IS SO ORDERED.

---

sent decree to "conform[ ] to the constitutional floor," and the public interest and allocation of powers within the federal system should be considered. 502 U.S. at 391–92, 112 S.Ct. at 763–64.

**34.** Indeed, a modification might threaten to undermine the substantive provisions of the injunctions. The Special Master has been instrumental in ensuring compliance with the injunctions, and has stated that he will be unable to "carry out any aspect of [his] court ordered responsibilities," and that a "delay [in payment] will necessitate the dismantling of the Special Master's operation." Special Master's Report, August 16, 1995, at 3.

**35.** *See* Defendants' Motion for Modification, at 4.